OPINION
{¶ 1} In this case, Appellant, John Werthmann, claims that he was unfairly treated by the majority stockholders in DONet, Inc. DONet is a close corporation that provides internet access, web page design, and internet-related services and products. DONet was originally started around ten years ago by David Mezera, Leigh Sandy, and Dave Hughes. About a year later, Werthmann agreed to moonlight at DONet to help with marketing and sales. Werthmann invested $8,500 in the company and received 85 shares of stock. At the time, Sandy and Werthmann were brothers-in-law.
 {¶ 2} When Werthmann began at DONet, he was working full-time at another job. Shortly after he started, the shareholders agreed that their original investments would be paid back in lieu of salary because no one working for DONet was receiving any money. Subsequently, Werthmann's investment was repaid with interest, and he retained his shares of stock. At the time Werthmann joined the company, Mezera was president, Sandy was vice-president, and Hughes was secretary of the corporation.
 {¶ 3} In June, 1997, Mezera began working full-time for DONet for a salary. At the time, Werthmann was receiving repayment on his investment, but no salary. Sandy then began working at DONet full-time in February, 1998. Shortly thereafter, Hughes decided to leave the company and sold his shares back to DONet for $7,500. These shares, 117 in number, were given to Werthmann, leaving him with 202 of the 850 outstanding shares.
 {¶ 4} The relationships and work environment at DONet were subject to conflict and stress, but the conflict appears to have ebbed and flowed. In 1995-1996, Mezera and Sandy had a falling out because Mezera did not think Sandy was working enough at the company to help it succeed. Subsequently, Mezera stepped down as president in May, 1998, because his mother was terminally ill. However, Mezera did continue his employment with DONet. When Mezera resigned, he asked Werthmann to be president. Werthmann then served as president until resigning in April, 2003.
 {¶ 5} In 1998, 1999, and 2000, DONet experienced a growth spurt under Werthmann's tenure. In January, 2000, discord developed among the partners as a result of a deal that Werthmann negotiated with the Dayton Area Board of Realtors (DABR). Mezera and Sandy complained that Werthmann had disregarded their wishes and instructions about the deal, but Werthmann disagreed. At the time, Mezera wrote Werthmann a letter, stating that Werthmann had done "amazing things" and had "helped make DONet a phenomenal success." However, Mezera also complained about Werthmann's failure to properly consult with his partners and stated that success had been purchased at the cost of the partners' friendship and trust. Mezera indicated that he did not want Werthmann in the position of president if Werthmann did not want to be the kind of "steward" that Mezera envisioned for DONet.
 {¶ 6} Although Werthmann offered to step down as president, the parties apparently resolved their issues, because he continued in the role of president. As president, Werthmann was in charge of marketing, sales, financial management, budgeting, and keeping up office personnel.
 {¶ 7} In March, 2001, Werthmann notified his partners that due to low amounts in the corporate checking account, DONet would have to use money from overdraft protection to meet payroll that week. Werthmann also indicated that he was not concerned about the dip in cash flow because DONet had significant sums due in accounts receivable that should be paid shortly. In response, Mezera wrote in an e-mail: "ouch. It seems virtually impossible for us to ever get a lasting lead on income over expenses. [F]or almost six years the pendulum has swung back and forth, right above 0." At that time, DONet had been in existence only about six years.
 {¶ 8} Subsequently, in November, 2001, Mezera and Werthmann exchanged e-mails about another employee, Jill Cassig, who also happened to be Mezera's sister. Cassig had complained to Mezera about her pay and about the fact that she and others were intimidated by Werthmann. This matter was apparently resolved in a meeting attended by Cassig, Mezera, and Werthmann, and there was no further correspondence about the issue after November, 2001.
 {¶ 9} In May, 2002, Werthmann wrote Mezera an e-mail indicating that Mezera's move to a new house had become a "number one" priority. Werthmann said that one of the ways Werthman and Sandy intended to deal with this priority was to give Mezera $1,000 more in pay per month, effective immediately, as a bonus advance. Although Werthmann and Sandy were also entitled to receive a similar bonus amount, they would wait to receive their money until the time of the yearly bonus. In an e-mail dated May 23, 2002, Mezera thanked Werthmann and Sandy for being flexible and stated that God had blessed him, his family, their business, and their relationships.
 {¶ 10} Werthmann and his wife separated in March, 2002, and were divorced in November of that year. During this same time frame, DONet entered into an agreement to purchase the internet access customer base from a company called SOLVE Interactive (SOLVE). Difficulties arose after this transaction. In particular, Mezera and Sandy were upset because they had asked that ownership of IP addresses be included in the agreement, but the addresses were not made part of the written agreement. Werthmann told them that he had received verbal assurances from SOLVE's president. However, DONet never received appropriate support or the IP addresses from SOLVE.
 {¶ 11} Further issues also arose about responsibility for paying a SOLVE database administrator who had been loaned to DONet to help move websites. The administrator did not perform as needed, and a dispute arose about whether DONet or SOLVE would be responsible for her salary. This issue was not satisfactorily resolved. Even though Werthmann offered to pay the bill from his own pocket, Mezera and Sandy felt betrayed because Werthmann did not properly support them in discussions with SOLVE about the salary issue.
 {¶ 12} At this time, Werthmann was also experiencing emotional problems due to his divorce. As a result, Mezera sent Werthmann an e-mail in January, 2003, indicating that their relationships had been strained. Mezera then stated that:
 {¶ 13} "Your first priority, however, needs to be right where you are placing it — your family and your own state of mind and health. If you need to take more time away from the office, perhaps even a short leave of absence, to rebuild yourself and your family relationships, Leigh and I would both understand."
 {¶ 14} Werthmann did not take a leave of absence at that time. Shortly thereafter, the issue of amending the close corporation agreement (CCA) surfaced. This led to one of the major disputes in this case.
 {¶ 15} Werthmann's divorce was the original impetus for amending the CCA. Although the divorce was final in November, 2002, the DONet stock had been omitted from the property settlement. Consequently, Werthmann notified Mezera and Sandy in February, 2003, that his ex-wife (Sandy's sister-in-law) was seeking half of Werthmann's stock. Under the existing CCA, DONet would have had to either purchase the shares at the value listed in the CCA, or amend the agreement to let non-employees hold stock. Although Werthmann took the lead in revising the document, the revisions were a group effort. The parties did not obtain legal advice before adopting the amendments.
 {¶ 16} Inexplicably, the original CCA is not part of the record, even though it was marked and identified at Mezera's deposition. However, we were able to glean adequate information about the original document from the testimony. The April 3, 2003 amendment changes the prior CCA in two significant ways. First, it allows non-employee shareholders to hold stock in DONet, if approved by a shareholder majority. CCA, § 2.01(a). Previously, the CCA did not permit non-employees to hold stock. Second, the amended CCA eliminates a requirement that DONet purchase the stock of non-employee shareholders at the share value listed in the CCA. Mezera's testimony indicated that under the original CCA, the corporation would dissolve if DONet either could not or would not purchase non-employee stock. The amended CCA removes this provision and allows the corporation to purchase shares at its discretion. See CCA, § 2.02(a).
 {¶ 17} The amended CCA was signed on April 3, 2003. Late that night, Werthmann wrote Mezera and Sandy to ask if he had done something recently to upset them. In response, Sandy responded that he was upset because Werthmann had taken over two weeks of vacation since the first of the year and had been out of the office a good bit. Werthmann wrote back indicating that he did not think he deserved criticism for taking time to get his personal situation in order, particularly since Mezera had suggested it. Werthmann also stated that he intended to seriously consider finding another job and becoming a "non-employee/non-officer stockholder."
 {¶ 18} On April 4, 2003, Sandy responded to Werthmann's further remarks by mentioning areas of dissatisfaction that led to him wanting a "change in leadership," including the SOLVE contractor issue, concern over finances, and the budget. Sandy ended the e-mail by stating that:
 {¶ 19} "In recent history, you have definitely not been of a solid state of mind to run the company effectively. It would be best for DONet (and you personally) to step away from being President of DONet. It may help you deal with the whole situation regarding the divorce and with DONet if you did something else less stressful (there is no such position at DONet). You had once mentioned wanting to teach at a University. If that is still a goal, now might be a good time to check it out."
 {¶ 20} There is no indication that Mezera responded to Werthmann's April 3, 2003 inquiry. Subsequently, on April 10, 2003, Werthmann asked for a meeting with his partners to discuss communication problems, but the meeting apparently never took place. On April 13, 2003, Mezera sent Werthmann an e-mail indicating that he would be making a motion to remove Werthmann as president at the annual meeting the following week. Mezera further indicated that he believed the motion would carry. In the e-mail, Mezera recounted dissatisfaction with the way in which Werthmann had handled the SOLVE acquisition, and Werthmann's "peculiar lackadaisical attitude" about cash flow problems. Mezera indicated that his opinion was based on years of personal experience working with Werthmann. In closing, Mezera stated that:
 {¶ 21} "This is not a course of action that I take lightly, nor is it rushed. * * * I have been hoping for months that you would recognize the desperate state of affairs and resign, but it does not appear that this is going to happen. It is in the best interests of all of us personally, and the interests of our employees and customers, that I will make this motion. It is my position that it is long overdue."
 {¶ 22} In testimony, Mezera also stated that he and Sandy had discussed terminating Werthmann's employment with DONet outside Werthmann's presence. Mezera additionally testified that he had considered asking for Werthmann's resignation before the CCA was amended.
 {¶ 23} On April 15, 2003, Mezera and Sandy told Werthmann that they wanted him to resign as president and to also leave the company. Werthmann said he was fine with stepping down as president, but wanted to stay on with the company. Mezera testified that he did not know what else Werthmann could have done in the company, because Werthmann was not technically qualified to hold a systems administrator position and could not have worked in customer service, at least at the salary he then held. In addition, DONet did not have a sales program.
 {¶ 24} Werthmann did not resign after the meeting on April 15, 2003. As a result, the parties had a follow-up meeting on April 24, 2003. Werthmann did resign as president after this meeting. He was also asked to take a leave of absence. In an e-mail dated April 24, 2003, Mezera indicated that there were no guarantees after the leave of absence was over. He specifically stated that the leave of absence "was intended primarily as a transition period, with pay and health care, for your benefit. At one point during our meeting you even described what we were talking about as a `severance package,' which I thought was appropriate."
 {¶ 25} The next day, Mezera asked Werthmann to propose what he considered to be a fair severance package. In this regard, Mezera also said that "Leigh [Sandy] and I will discuss whatever you propose, and if either one of us agrees with your proposal it would have sufficient support to get it approved."
 {¶ 26} When Werthmann did not propose a severance package, Mezera sent his own proposal on May 8, 2003. In testimony, Mezera stated that he personally decided Werthmann should no longer stay with DONet when he saw an entry in the "ticket system" indicating that Werthmann had conversations with a customer after taking the leave of absence. The ticket indicates that Mezera reassigned the ticket to himself on May 2, 2003, canceled the contract (which was for advertising with WHIO-TV), and closed the ticket on May 9, 2003.
 {¶ 27} After a few more exchanges about the severance package, Werthmann signed the severance agreement on May 22, 2003. The amount of the package was about $31,790, which included ten weeks base salary (minus the four weeks that were already being paid as part of the leave of absence), an advance bonus of $13,000, health care premiums, and contributions to Werthmann's retirement account. Payments for base pay would end on July 5, 2003. Mezera also offered to buy Werthmann's shares, but said he would want a formal valuation before committing to such a large purchase. At that time, Werthmann declined to sell his shares.
 {¶ 28} Subsequently, on August 9, 2003, Werthmann offered to sell 21 shares and asked that DONet pay for the shares over a period of ten months. In the letter, Werthmann stated that he needed the proceeds for a new business venture called Exemplar Systems, LCC. Mezera responded that he and Sandy could reject a buy back request in the absence of a bona fide offer by a third party. He also stated that if they elected to purchase any stock, they would want to have a formal stock valuation based on accepted accounting principles. Additional caveats were that DONet might want to purchase all stock to avoid multiple requests, and, would pay only 5% down at closing and the rest in 120 equal installments, plus interest, as specified in the CCA. Notably, DONet was a close corporation, and a stock dividend had never been paid. Instead, the partners had received a share of the profits in the form of employee bonuses.
 {¶ 29} Ultimately, on August 19, 2003, Mezera offered to buy all Werthmann's own stock (about 151 shares), for a price of $1,000 per share, again with 5% of the purchase price being paid at closing and the rest to be paid in 120 equal installments, plus interest. At the time, the stock was valued at $2,941.18 per share in the amended CCA. The share value listed in the prior CCA was about $2,500 per share. According to Mezera, these values were mere estimates or guesses. Werthmann disagreed, and testified that the stock valuation was consistent with industry practice, which was to divide annual revenue by the total number of shares.
 {¶ 30} On August 28, 2003, Werthmann rejected the offer to purchase all his stock, and this lawsuit followed. In granting summary judgment in favor of DONet, Sandy, and Mezera, the trial court found that Werthmann had voluntarily resigned from his office as president of DONet and had failed to establish he was employed in any other capacity. In addition, the court found that Werthmann had failed to submit any evidence whatsoever that the Defendants' conduct leading up to his resignation breached the heightened standard of care required of shareholders in a close corporation. Finally, the court found no breach of contract because the Defendants were not required by the CCA to purchase Werthmann's shares.
 {¶ 31} In support of the appeal, Werthmann raises the following assignments of error:
 {¶ 32} "I. The trial court erred in granting summary judgment against Appellant on all of Appellant's breach of fiduciary duty claims.
 {¶ 33} "II. The trial court erred in granting summary judgment against Appellant on his declaratory judgment cause of action.
 {¶ 34} "III. The trial court erred in granting summary judgment against Appellant regarding his breach of contract claim.
 {¶ 35} "IV. The trial court erred in granting summary judgment against Appellant on his wrongful termination claim.
 {¶ 36} "V. The trial court erred in granting summary judgment against Appellant on his conversion claim.
 {¶ 37} "VI. The trial court erred in granting summary judgment against Appellant on his civil conspiracy claim.
 {¶ 38} "VII. The trial court erred in granting summary judgment against Appellant regarding his fraud claim."
 {¶ 39} After considering the evidence presented and the applicable law, we find that assignments of error one, two, four, five, six, and seven have merit, and that assignment of error three is without merit. Accordingly, the judgment of the trial court will be reversed in part and affirmed in part. A discussion of our reasoning is set forth below.
 I {¶ 40} In the first assignment of error, Werthmann contends that the trial court erred in granting summary judgment on his claims for breach of fiduciary duty. Specifically, Werthmann contends that a jury could reasonably find that Mezera and Sandy acted in bad faith or maliciously by modifying the CCA to their benefit, while concealing that they were considering terminating Werthmann's employment.
 {¶ 41} We review summary judgment decision de novo, which means that "we apply the standards used by the trial court." Brinkman v. Doughty
(2000),140 Ohio App.3d 494, 496, 748 N.E.2d 116. Summary judgment is appropriately granted where the trial court finds: "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor."Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66,375 N.E.2d 46.
 {¶ 42} The elements of breach of fiduciary duty are: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom."Harwood v. Pappas Assoc., Inc., Cuyahoga App. No. 84761, 2005-Ohio-2442, at ¶ 26, citing Strock v. Pressnell (1988), 38 Ohio St.3d 207, 216. Concerning the first element, the shareholders in DONet owed each other a duty arising from a fiduciary relationship, because they were members of a close corporation. Crosby v. Beam (1989), 47 Ohio St.3d 105, 108,548 N.E.2d 217.
 {¶ 43} In Crosby, the Ohio Supreme Court noted that "[t]ypically, a close corporation is a corporation with a few shareholders and whose corporate shares are not generally traded on a securities market." Id. at 107. The court also observed that:
 {¶ 44} "[c]lose corporations bear a striking resemblance to a partnership. In essence, the ownership of a close corporation is limited to a small number of people who are dependent on each other for the enterprise to succeed. Just like a partnership, the relationship between the shareholders must be one of trust, confidence and loyalty if the close corporation is to thrive. While a close corporation provides the same benefits as do other corporations, such as limited liability and perpetuity, the close corporation structure also gives majority or controlling shareholders opportunities to oppress minority shareholders. For example, the majority or controlling shareholders may refuse to declare dividends, may grant majority shareholders-officers exorbitant salaries and bonuses, or pay high rent for property leased from the majority shareholders." Id. at 107-08 (citation omitted).
 {¶ 45} Because there is generally "no ready or available market for the stock of a minority shareholder in a close corporation," a minority shareholder can be "trapped in a disadvantageous situation from which he cannot be easily extricated." Id. at 108. Accordingly, shareholders in close corporations owe each other a duty of the "`"utmost good faith and loyalty."'" Id. (Citation omitted).
 {¶ 46} As an example of a breach of fiduciary duty, the Crosby court cited a case in which majority shareholders had removed a minority shareholder "from the payroll of a close corporation, which had never paid a dividend, and there was no legitimate business reason for the removal." Id. at 109 (citation omitted). This is a situation that is similar to the present case. As we mentioned earlier, DONet has never paid a dividend, and the means of distributing profit has been to give the partners employee bonuses. While Werthmann could have been removed for legitimate business purposes, we believe there are issues of fact on that point. Mezera gave certain reasons for removing Werthmann, and those reasons may ultimately convince a jury. However, the disparity in treatment of the partners, as well as the timing of the CCA amendment raise genuine issues of material fact in connection with the claim for breach of fiduciary duty.
 {¶ 47} For example, Mezera urged Werthmann in January, 2003, to take more time away from the office or even a short leave of absence, yet Werthmann's absence from the office after that was one reason cited for his removal. Similarly, Werthmann was criticized about cash flow problems that occurred in March, 2001, but Mezera stated at the time that "It seems virtually impossible for us to ever get a lasting lead on income over expenses. [F]or almost six years the pendulum has swung back and forth, right above 0." At the time this cash flow problem occurred, Werthmann had been in charge of finances for only three years; the other three years of cash flow problems would have occurred when Mezera was president.
 {¶ 48} Further, in May, 2002, Mezera began to receive an advance on his year-end bonus and was making more money than Sandy and Werthmann, who were waiting for the end of the fiscal year. The following year, Werthmann needed to receive advances on his bonus due to financial problems caused by his divorce, but was criticized for not taking a salary cut when the company needed to make budget cuts. Werthmann was also criticized in connection with the SOLVE acquisition, but Mezera admitted that DONet probably made money on the deal. As we said, while there may well have been legitimate business reasons for Werthmann's ouster, it is not our duty, nor is it the role of the trial court, to weigh the evidence.
 {¶ 49} More importantly, the timing of the CCA amendments is troublesome. Werthmann contends that Sandy and Mezera should have informed him of the consequences of amending the CCA to eliminate the requirement that DONet purchase non-employee stock. We do not agree that anyone had a duty to tell Werthmann that fact, since he was as capable as the others of reading the document. However, Mezera and Sandy did have a duty to inform Werthmann that they intended to force his resignation and terminate his employment within days after he agreed to amend the CCA to his detriment. In the alternative, if Sandy and Mezera did not want to disclose their intention of forcing Werthmann out of DONet, they should have refrained from taking actions that adversely affected his existing right to make DONet repurchase his shares. In this regard, we focus on Mezera's own testimony that he had been hoping for months that Werthmann would resign, that he had considered asking for Werthmann's resignation before the CCA was amended, and that he and Sandy had discussed terminating Werthmann's employment with DONet outside Werthmann's presence. Admittedly, there are factual issues and disputes on these points. However, this simply means that summary judgment is not proper.
 {¶ 50} As an additional matter, we note that no dividends were paid after Werthmann was terminated (nor were any dividends ever paid at any point in DONet history). However, both Mezera and Sandy awarded themselves and other employees bonuses after Werthmann left the company. There is no indication that other employees had previously been given bonuses. From these facts, one could infer that Mezera, Sandy, and other employees received bonuses so that dividends would not have to be paid to Werthmann.
 {¶ 51} In responding to Werthmann's arguments, Sandy and Mezera argue that they acted in conformity with the CCA because Werthmann voluntarily resigned as president. They also claim that the CCA did not require legitimate reasons for removing an officer. And finally, they contend that Werthmann affirmatively waived any fiduciary duty when he willingly stepped down as president. We disagree.
 {¶ 52} In the first place, the trial court did not decide summary judgment on the basis of waiver. Instead, the court focused only on whether Werthmann presented evidence that Mezera and Sandy breached their fiduciary duty of acting in good faith. Unlike the trial court, we have concluded that factual issues exist on this point.
 {¶ 53} Parties can waive common law duties, like fiduciary duties, in documents that they sign. Cruz v. South Dayton Urological Associates,Inc. (1997), 121 Ohio App.3d 655, 663, 700 N.E.2d 675. Consequently, Werthmann could have agreed in the CCA to be removed or terminated without cause. Id. The amended CCA is ambiguous on the issue of cause, however, as it contains conflicting provisions.
 {¶ 54} In Article III, § 3.05, the CCA provides that the corporation shall have various officers, and lists the officers by both position and name. Werthmann is listed as president and treasurer. § 3.05(c) further says that "Officers shall hold office so long as they actively participate in the Corporation's business and satisfactorily perform their duties." § 3.05(d) then states that "Officers may be removed for unsatisfactory performance on the affirmative vote of fifty-one percent of the Corporation's outstanding shares." Thus, these provisions require cause before an officer may be removed.
 {¶ 55} In contrast, Article III, § 3.07 of the CCA states that corporate officers serve at the pleasure of the shareholders and may be removed from office at any time without cause, by action of the shareholders. This section also provides that officers shall be removed if they resign or leave employment with the corporation.
 {¶ 56} In view of the complete inconsistency of the above provisions, we cannot find that Werthmann agreed to being removed without cause. Furthermore, the claim that Werthmann voluntarily resigned as president must be viewed with some skepticism. Mezera and Sandy asked Werthmann to resign. Mezera also testified that if Werthmann had not resigned, they would have voted him out. Under the circumstances, the resignation could hardly be deemed voluntary. Furthermore, even if Werthmann stated that he was thinking of resigning, or even agreed at one point with such a suggestion, these are facts to be weighed by a jury. This is particularly true in light of the history of the parties, i.e., Werthmann had offered in the past to resign when a dispute developed, but things had been worked out.
 {¶ 57} As an additional matter, even if the CCA provisions were consistent, Werthmann did not waive a fiduciary duty with regard to being informed of the intentions of majority shareholders. In other words, even if officers serve at pleasure, majority shareholders cannot obtain damaging amendments to a close corporation agreement by concealing their intention to use the amendments against a minority shareholder. We must stress that we are not saying this is what occurred; we are indicating that factual issues exist on this point.
 {¶ 58} A jury may find, after hearing all the testimony, that Sandy and Mezera had legitimate business reasons to amend the CCA, to force Werthmann's resignation and to terminate his employment. We express no opinion on the merits of the case. Instead, we simply find genuine issues of material fact concerning whether Werthmann's "ouster was initiated for legitimate business purposes and in good faith." Gigax v. Repka (1992),83 Ohio App.3d 615, 623, 615 N.E.2d 644. Accordingly, the trial court erred in granting summary judgment on the claims for breach of fiduciary duty.
 II {¶ 59} In the second assignment of error, Werthmann contends that the trial court erred in granting summary judgment on the declaratory judgment claim. Declaratory judgments define the rights and duties of parties. Worthington Nursing Home, Inc. v. Creasy (1982),4 Ohio App.3d 92, 98, 446 N.E.2d 841. In order to maintain a declaratory judgment, three elements are required:
 {¶ 60} "(1) that a real controversy between adverse parties exists; (2) which is justiciable in character; (3) and that speedy relief is necessary to the preservation of rights which may be otherwise impaired or lost." Fairview General Hospital v. Fletcher (1992), 63 Ohio St.3d 146,148-149, 586 N.E.2d 80.
 {¶ 61} Furthermore, even if alternate remedies exist, a declaratory judgment action may be maintained if it is within the intent of the Declaratory Judgment Act. Herrick v. Kosydar (1975), 44 Ohio St.2d 128,129-30, 339 N.E.2d 626 (discussing the predecessor to R.C. 2721.03). Under the current version of the Declaratory Judgment Act, any person interested under a written contract may have determined "any question or validity arising under the instrument * * * and obtain a declaration of rights, status, or other legal relations under it." R.C. 2721.03.
 {¶ 62} After outlining the necessary elements of declaratory judgment actions, the trial court found that Werthmann had failed to set out specific evidence of a "real controversy." The court, therefore, rejected the declaratory judgment claim without considering the remaining elements.
 {¶ 63} Because we have concluded that a real controversy does exist between adverse parties, we also find that the trial court erred in granting summary judgment on the declaratory judgment claim. Werthmann's claim is based on a written contract, i.e., the CCA, and it is within the spirit of the Declaratory Judgment Act. See, e.g., Justarr Corp. v.Buckeye Union Ins. Co. (1995), 102 Ohio App.3d 222, 656 N.E.2d 1345
(action for reformation of written contract brought under R.C. 2721.03);State ex rel. Stec v. Bd. of Ed. of Lorain City School Dist. (1974),49 Ohio App.2d 101, 359 N.E.2d 445 (declaratory judgment action is proper method for deciding if teacher is entitled to a continuing service contract); and Ohio Hosp. Ass'n v. Community Mut. Ins. Co. (1987),31 Ohio St.3d 215, 219, 509 N.E.2d 1263 (while exclusive remedy for testing validity of corporate franchise is quo warranto action, trial court has jurisdiction to determine rights and obligations of parties, so long as corporate existence is not questioned).
 {¶ 64} In the present case, Werthmann claimed in the complaint that the stock transfer restrictions in the amended CCA were void and unenforceable to the extent that they affected a freeze-out. As we said, genuine issues of material fact exist regarding this issue.
 {¶ 65} Based on the preceding discussion, the trial court erred in finding that no real controversy exists. Accordingly, the second assignment of error has merit and is sustained.
 III {¶ 66} The third assignment of error challenges the trial court's decision to grant summary judgment on the breach of contract claim In the fifth cause of action in the complaint, Werthmann alleged that Sandy and Mezera breached the CCA by failing to purchase his stock at the share value specified in the new CCA. The trial court found that no breach had occurred because the amended CCA did not require DONet to purchase stock absent a bona fide offer from a third party. Werthmann argues that this was incorrect because Sandy and Mezera duped him into agreeing to modifications that deprived him of his prior contractual right to require DONet to purchase his stock. Werthmann also contends that the Defendants' duplicitous actions in modifying the CCA make the modifications voidable. And finally, Werthmann claims that a purchase of minority shares at less than full value is a separate and distinct breach of fiduciary duty.
 {¶ 67} To successfully prosecute a breach of contract action, a plaintiff must present evidence of "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." Doner v. Snapp (1994), 98 Ohio App.3d 597, 600-601,649 N.E.2d 42 (citation omitted). If we view the claim in Count Five in isolation, we would have to agree that Werthmann failed to establish issues of fact regarding breach of the amended CCA. Specifically, the amended CCA requires DONet to purchase stock only in one limited situation, which does not apply to this case.
 {¶ 68} Article II, § 2.02(a) of the CCA states that:
 {¶ 69} "the Corporation may, in its discretion, purchase shares from shareholders under the conditions described in Section 2.03. The Corporation shall also purchase shares from shareholders as required in Section 2.10."
 {¶ 70} § 2.10 deals with the death of people designated as "key men" within DONet. If a "key man" dies, his agent may elect to sell all or part of the key man's shares back to DONet. In that event, DONet must buy back the shares at the share value provided in § 2.02. This is the only mandatory buy back situation in the CCA. In all other situations, DONet has discretion on whether to buy back shares.
 {¶ 71} Under § 2.03(a), sellers are prohibited from transferring shares unless they offer in writing, to transfer the shares to DONet on terms identical to those the seller has received from a buyer. § 2.03(b) further provides that DONet must accept or reject a seller's offer within ten days after receipt of a bona fide offer, identified as such, and also identifying the buyer. If DONet rejects the offer, the shareholders are then required to reject or accept the offer within thirty days. If neither DONet nor the shareholders accepts the offer, the seller may transfer the shares to the proposed buyer under the same terms as were offered to DONet. § 203(d). The CCA sets the share price for shares sold under 2.10 and 2.03(d) as "share value." § 2.06(a). At the time the CCA was amended in April, 2003, the share value was set at $2,941.18.
 {¶ 72} As we noted earlier, Werthmann's leave of absence from DONet began on April 24, 2003, and the severance agreement was signed on May 22, 2003. In August, 2003, Werthmann offered to sell DONet 21 shares of stock at $2,941 per share, citing financial necessity. Mezera and Sandy did not accept this offer, but proposed a purchase of all Werthmann's outstanding stock at $1,000 per share.
 {¶ 73} Notably, Werthmann did not have a buyer for his stock at the time of the offer. However, even if Werthmann did have a buyer, that would not have forced either DONet or the shareholders to buy the stock, since the CCA clearly gives these parties the right to accept or reject offers. Since there was no obligation to buy the stock, Mezera and Sandy could not have breached the CCA by refusing to buy the stock, or by offering Werthmann a price below the share value listed in the CCA. Consequently, we agree with the trial court that summary judgment on this specific contractual claim was proper.
 {¶ 74} Furthermore, to the extent that Werthmann relies on the proposition that a sale for less than share value is a breach of fiduciary duty, we should point out that no sale occurred. Therefore, even if the offer was insufficient, Werthmann still retains his stock and has not yet suffered a loss. Compare Wrightsel v. Ross-Co Redi-Mix, Inc. (Mar. 26, 1993), Ross App. No. 1791, 1993 WL 97780, *6. In Wrightsel, a minority shareholder was forced out of employment and sold his stock for less than its value. After trial, the minority shareholder was awarded the difference between the sale price and the stock's fair market value. Id. If Werthmann had actually sold his shares to DONet or to Mezera and Sandy, he might have had a claim for breach of fiduciary duty based on having received an inadequate price. However, that was not what occurred.
 {¶ 75} We should note that our holding on the contractual issue does not preclude Werthmann from attempting to void the stock transfer restrictions or any other part of the amended CCA that was challenged as a breach of fiduciary duty or as part of an attempted "freeze-out" or "squeeze out." The fact that Mezera and Sandy offered Werthmann only about one-third the share value listed in the CCA less than four months after the share value was set, may bear on whether they acted with "utmost good faith and loyalty" to their minority shareholder. Gigax,83 Ohio App.3d at 621. In this regard, we should note that we are aware of Mezera's testimony that the share price listed in the CCA was just a "wag," i.e. a wild guess. However, this simply indicates that factual issues exist, since Werthmann testified that the value was assessed in a manner consistent with industry standards. After hearing the evidence, a jury may find that the $1,000 per share offer was made in good faith and not as part of an attempt to "freeze out" Werthmann. By the same token, a jury might also conclude that the actions of the majority shareholders were not made in good faith.
 {¶ 76} With the caveat expressed, we find the third assignment of error without merit.
 IV {¶ 77} In the fourth assignment of error, Werthmann contends that the trial court erred in granting summary judgment on his claim for wrongful termination. The trial court did not separately discuss wrongful termination, but found that it was intertwined with the claim for breach of fiduciary duty. We agree. Notably, when we discussed the first assignment of error, we found genuine issues of material fact concerning both wrongful termination and breach of fiduciary duty. The same findings apply to this assignment of error. However, we will briefly discuss the points that the parties have raised.
 {¶ 78} Ohio generally follows the rule that employees are terminable-at-will, but we have held in the context of close corporations that employee/shareholder/directors in close corporations are not employees "terminable at will at any time by the majority or controlling shareholder/directors." Gigax, 83 Ohio App.3d at 622-23 (emphasis in original). In particular, we stressed in Gigax that "the fiduciary duty that partners owe each other requires that the removal of a partner be based on legitimate business reasons." Id. at 623. As we said earlier, there are genuine issues of material fact regarding the legitimacy of the business reasons for Werthmann's ouster.
 {¶ 79} In arguing that summary judgment on the wrongful termination claim was proper, Mezera and Sandy contend that Werthmann voluntarily resigned from his position as president and also accepted a severance package when his employment was terminated. Therefore, they feel that Werthmann has waived any claims for breach of fiduciary duty. In response, Werthmann argues that he was constructively discharged. In view of our prior findings, we need not discuss this point in detail. However, we briefly note that in a constructive discharge situation, a former employee must show that:
 {¶ 80} "`the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.' * * * In essence, in a constructive discharge, the employer has forced the employee to sever the employment relationship involuntarily. * * * A constructive termination is, in the eyes of the law, a termination, not merely a form of employer discipline." Powers v.Springfield City Schools (June 26, 1998), Clark App. No. 98-CA-10, 1998 WL 336782, *5 (citations omitted).
 {¶ 81} After reviewing the evidence, we find genuine issues of fact regarding whether Werthmann's resignation as president and his termination as a DONet employee were voluntary. It is hard to view a resignation as voluntary when the individual in question is told that majority stockholders will vote him out of office if he fails to resign. The fact that Werthmann may have made statements at one time or another about agreeing with a suggested course of action is not dispositive. To the contrary, it creates issues of fact, particularly since the record is replete with indications that Werthmann felt compelled to resign.
 {¶ 82} Furthermore, the fact that Werthmann accepted a severance package and left employment with DONet does not mean that he voluntarily quit. Again, in this situation, the handwriting was on the wall. We also note that the severance agreement did not contain any waiver language, nor did it include a release of liability. Instead, the agreement merely required Werthmann to co-operate in pending litigation and to protect sensitive DONet company information. Werthmann also agreed not to solicit DONet customers.
 {¶ 83} Because genuine issues of fact exist concerning wrongful termination, the trial court erred in granting summary judgment on this issue. Accordingly, the fourth assignment of error is sustained.
 V {¶ 84} The remaining assignments of error contest the trial court's grant of summary judgment against Werthmann on claims for conversion, civil conspiracy, and fraud. Instead of separately discussing these matters, the trial court simply stated that it found no facts or evidence to support the claims.
 {¶ 85} "[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." Joycev. General Motors Corp. (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172. According to Werthmann, Mezera and Sandy: (1) exerted dominion over his stock by wrongfully refusing to purchase it; and 2) exerted dominion over his retained salary, benefits, and bonuses, and derived personal benefit by paying employee bonuses and investing in equipment.
 {¶ 86} In contrast, Mezera and Sandy argue that they had no duty to purchase the stock. They also note that when Werthmann was asked during his deposition to identify the basis for the conversion claim, he stated that he did not have any facts. Although the question asked for a legal conclusion, Werthmann's counsel failed to object at the time of the deposition.
 {¶ 87} As a preliminary point, we note that failure to object during a deposition does not waive objections to the competency of testimony unless the ground for objection is one that might have been removed if properly presented. Civ. R. 32(D)(3). See, also, Charles R. CombsTrucking, Inc. v. International Harvester Co. (Dec. 30, 1982), Butler App. No. 81-04-0026, 1982 WL 3316, *12-13, reversed in part on other grounds (1984), 12 Ohio St.3d 241, 466 N.E.2d 883 (objection to testimony about a legal conclusion was not waived because the ground for objection could not have been removed or cured at deposition). Accordingly, even though Werthmann's counsel failed to object during deposition, Werthman may still argue on appeal that he should not be bound by his statement and should not be expected to be familiar with legal theories. As a general matter, we agree.
 {¶ 88} Whether facts exist to support conversion is the ultimate question for a jury to decide, based on the evidence presented at trial and the legal instructions of the trial court. Similarly, on summary judgment, the issue is one to be decided by the trial judge (or appellate court), based on the facts presented — not on Mr. Werthmann's opinion about particular legal theories. Accord, Clifford v. Hagerich (Nov. 26, 1986), Lorain App. Nos. 3974, 4002, 1986 WL 13853, *3 (commenting that a layman's testimony about a legal conclusion has no probative value). The Ohio Supreme Court has also stressed that "[l]egal theories are ordinarily not within the province of the average layman." Hershbergerv. Akron City Hosp. (1987), 34 Ohio St.3d 1, 5, 516 N.E.2d 204. Accordingly, we attach little weight to Werthmann's deposition testimony about conversion.
 {¶ 89} Turning now to the merits of the argument, we find that summary judgment on the conversion claim was improper, at least as to one aspect of the claim. As should be apparent from our discussion of breach of contract, Mezera and Sandy could not have converted Werthmann's stock because they had no obligation to purchase the stock, nor did they finalize a purchase. This leaves conversion based on the alleged unlawful retention of Werthmann's salary and bonuses.
 {¶ 90} In Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 285,741 N.E.2d 155, we held that a conversion claim could be maintained by a plaintiff whose partnership interest had been reduced from twenty-five percent to nineteen percent as the result of an unlawful capital call. The present case involves a slightly different situation, in that Werthmann claims that profits and salary belonging to him have been unlawfully retained by DONet and the majority shareholders. However, one of the cases we cited in Schafer dealt with claims that defendants had wrongfully appropriated moneys, equipment, contractual rights, and inventory. Id. at 286, citing Wellington Systems, Inc. v. Redding Group,Inc. (1998), 49 Conn. App. 152, 169, 714 A.2d 21. The money at issue in Wellington included post-dissolution profits of a partnership.49 Conn. App. at 154-56 and 169.
 {¶ 91} There may be some overlap in the present case between alleged damages for breach of fiduciary duty and the conversion claim. However, that is a matter to be resolved at trial. Accordingly, the trial court erred in granting summary judgment against Werthmann on his claim for conversion.
 {¶ 92} The argument in connection with the civil conspiracy claim is essentially the same, i.e., that Werthmann said during his deposition that he had no facts to support the claim. As we stressed in our discussion of conversion, Werthmann's opinion of his claim has no probative value. Furthermore, what Werthmann actually said in his deposition was that "I don't have any facts. Just the sequence of events that occurred." In our earlier discussion, we indicated that the sequence of events in this case is troubling and precludes summary judgment. The same reasoning applies to the civil conspiracy claim, which requires:
 {¶ 93} "(1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself. * * * The malice portion of the tort is `that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'" Gibson v. City Yellow Cab Co. (Nov. 26, 2001), 2001 WL 123467, *3 (citations omitted).
 {¶ 94} In Gibson, the court used a breach of fiduciary duty as the underlying unlawful act for the conspiracy. Id. at *4. The present case also involves a fiduciary duty, as well as two people who allegedly caused injury to their minority shareholder without a reasonable or lawful excuse. Of course, there are factual issues in this regard, as the majority shareholders claim they had legitimate business reasons for their actions. As we have stressed before, we express no opinion on the merits of the case; we are merely saying that genuine issues of material fact exist, precluding summary judgment. Consequently, the trial court erred in granting summary judgment on the civil conspiracy claim as well.
 {¶ 95} The final matter to be addressed is the fraud claim. In order to establish fraud, the plaintiff must prove:
 {¶ 96} "(a) a representation or, where there is a duty to disclose, concealment of a fact,
 {¶ 97} "(b) which is material to the transaction at hand,
 {¶ 98} "(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
 {¶ 99} "(d) with the intent of misleading another into relying upon it,
 {¶ 100} "(e) justifiable reliance upon the representation or concealment, and
 {¶ 101} "(f) a resulting injury proximately caused by the reliance."Burr v. Board of County Com'rs of Stark County (1986), 23 Ohio St.3d 69,491 N.E.2d 1101.
 {¶ 102} Based on our previous discussion, we find genuine issues of material fact regarding the fraud claim. As we noted, Mezera and Sandy had a fiduciary duty to Werthmann, which included disclosing their plans before the CCA was amended. Knowledge of these plans or intent would have been material, because Werthmann gave up his right to force DONet to purchase his stock in the event that he was terminated. Whether the majority stockholders' statements were made with knowledge of their falsity or with reckless disregard, and whether Werthmann justifiably relied on the statements or concealment of intent are obviously factual issues that will be decided by a jury. At this point, we merely find issues of fact precluding summary judgment.
 {¶ 103} Accordingly, and based on the preceding discussion, the fifth, sixth, and seventh assignments of error have merit and are sustained.
 VI {¶ 104} One additional point remains for discussion. In subparagraph "F" of the brief, Werthmann argues that Sandy and Mezera breached their fiduciary duties to him by using DONet funds to pay their personal legal expenses. Werthmann also refers to this point in subparagraph "H" of his brief. According to Werthmann, § 3.06(f) of the CCA allows indemnification of officers only after authorization by a majority of stockholders, which has not occurred. Werthmann contends that, as a shareholder, he is unlawfully being forced to pay personal legal fees for Mezera and Sandy.
 {¶ 105} In their brief, Mezera and Sandy state that they have never incurred any legal fees and have not been invoiced for any fees. They also claim that bifurcation of the claims is not feasible. And finally, they argue that this matter is not ripe because it was not explored or raised below, even though it was pled in the complaint.
 {¶ 106} We agree that the matter is not yet ripe, as no evidence was presented below about attorney fees. As a result, we decline to address this matter, beyond noting that almost no allegations in the complaint, and virtually no discussion on appeal relate to DONet, as a corporation, or to actions of Mezera and Sandy taken on behalf of DONet. Instead, the allegations pertain to alleged wrongful actions of Mezera and Sandy as majority stockholders, for their own benefit. Where an owner of a close corporation or a subchapter S corporation uses corporate assets to pay for personal expenses, like attorney fees, the payments have been treated as shareholder loans, repayable to the corporation. See, e.g., Levine v.Levine, Franklin App. No. 02AP-399, 2002-Ohio-7198, at ¶ s 36-39.
 {¶ 107} Although Levine was a divorce case, its treatment of expenses is pertinent to cases involving claims that are essentially against majority shareholders, not the corporation. Morever, while the present case is not a shareholder derivative action, courts have held in such situations that a "benefit to the corporation must be demonstrated" before attorney fees can be awarded. Mlinarcik v. E.E. Wehrung Parking,Inc. (1993), 86 Ohio App.3d 134, 146, 620 N.E.2d 181. See, also,Griesse v. Lang (1931), 37 Ohio App. 553, 558, 175 N.E. 222 (holding that "[d]irectors may be required to return to the corporate treasury money expended by them to defend suits brought against certain directors individually which did not affect the corporation's rights, where all the stockholders did not consent to such expenditure").
 {¶ 108} As we said, we will not rule on this matter because it is not ripe. In addition, it was not raised as a formal assignment of error.
 {¶ 109} Based on the preceding discussion, assignments of error one, two, four, five, six, and seven are sustained, and the third assignment of error is overruled. Accordingly, the judgment of the trial court is reversed in part and affirmed in part, and is remanded for further proceedings.
Donovan, J., and Young, J., concur.
(Hon. Frederick N. Young, Retired from the Court of Appeals, Second Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio)