JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant Dale Harwood ("Harwood") commenced this action against defendants-appellees[1] alleging fraud and seeking, inter alia, damages and recission of the land installment contracts he entered concerning two real estate parcels. Harwood appeals from the directed verdicts of the trial court that dismissed his claims against all of the defendants-appellees.[2] For the reasons that follow, we affirm.
 Standard of Review {¶ 2} The appellate court conducts a de novo review of a judgment on a motion for directed verdict. Howell v. Dayton Power Light Co. (1995),102 Ohio App.3d 6, 13.
 {¶ 3} Civ.R. 50(A)(4) sets forth the standard for granting a motion for directed verdict as follows: "[w]hen a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue. See, also,Limited Stores, Inc. v. Pan American World Airways, Inc. (1992),65 Ohio St.3d 66.
 {¶ 4} The facts, as construed under the above standard, are as follows. In 2001, the Pappas Defendants listed two properties for sale with Keller and Williams' agent Demby: 3719 Fulton Road, Cleveland, Ohio (the "Fulton Property) and 11115 Detroit Avenue, Cleveland, Ohio (the "Detroit Property"). Demby had a friendship with Pappas, which he orally disclosed to Harwood but did not do so in writing.
 {¶ 5} Harwood, who is an experienced real estate investor and former real estate agent, viewed the properties in 2001 but declined to make an offer. Harwood lives in California and did at all times relevant to this action. Harwood developed a relationship with Demby, which evolved over time to include social interactions.
 {¶ 6} Demby's exclusive listing agreement on the Fulton and Detroit properties expired. In 2003, Demby contacted Harwood to let him know the properties were still on the market and that Pappas might be offering better terms. Harwood was interested and instructed Demby to prepare offers on his behalf. Demby did so on Keller Williams' preprinted residential real estate purchase forms. Thereon, Harwood offered to purchase both parcels in "its `AS IS' PRESENT PHYSICAL CONDITION.'"[3]
Plaintiff's Exhibits 1 and 2 (emphasis in the original). The proposed closing was set for May 23, 2003. Harwood changed only the closing date to June 2, 2003, but otherwise accepted the offer. Nonetheless, negotiations continued and the parties discussed other options, including that Harwood buy the S corporation that held the parcels. Ultimately, the parties arranged to enter land installment contracts.
 {¶ 7} Karris was selected to draw up the contracts. Karris was both an attorney and owned the title company Priority One. According to Harwood, Karris had "intimate" knowledge of PA, since Pappas had been his client. Harwood, as a result, thought Karris was the "logical" choice to draw up the land installment contracts. In addition, Priority One[4]
was the title company identified in Harwood's intial purchase agreements. (Plaintiff's Exhibits 1 and 2). Karris drafted a separate land installment contract for each property. The terms provided that PA would give possession to Harwood "on June 12, 2003 or any other date mutually agreed by the parties." Title to the properties was not to be transferred until July 1, 2009 and then only upon Harwood's observance and performance of all obligations and terms of the agreements.
 {¶ 8} At Harwood's request, Demby obtained permission from Pappas to access the buildings for roof inspections on June 12, 2003. Harwood attended the inspections with an inspector of his own choosing. The Detroit roof presented no surprises; however, the Fulton roof was in need of replacement. The inspector was unable to provide an estimate on the spot.
 {¶ 9} Harwood testified that "some adjustments were going to have to be made to go forward." Demby phoned Pappas from the Fulton Property to discuss the issue. Demby told Harwood that Pappas was willing to contribute to the repair of the Fulton roof and that it would be worked out when Pappas returned from Denver.[5] This apparently satisfied Harwood who proceeded to the offices of Priority One where he met with Karris and signed the contracts.
 {¶ 10} Harwood did not request, and no provision was made for, contingencies relative to the roof repairs. Harwood admitted that he knew he had the option to include such provisions but did not. Harwood also made out two checks totaling $65,000 made payable to PA. Although Harwood testified that he knew he could have placed restrictions on the checks, he admitted that he did not. Harwood states that he told Karris to hold the checks in the file but admits that he did not give any written instructions in that regard.
 {¶ 11} That same day, June 12, 2003, Pappas faxed a signed copy of the contracts to Priority One. Once the checks cleared, the funds were dispersed according to Pappas' instruction and the keys were delivered to Radcliffe. Radcliffe manages some of Harwood's investment properties in Cleveland.[6] Radcliffe sent a letter to the tenants advising them of the change in ownership.
 {¶ 12} Upon his return to Cleveland, Pappas went to Priority One where he had his signature of June 12, 2003 acknowledged by a notary.
 {¶ 13} When Harwood received an estimate to replace the Fulton roof for approximately $18,000, Pappas agreed to contribute $4,000. Harwood instructed Radcliffe to return the keys and notify the tenants he was not the owner. Demby contacted Harwood and told him he obtained an estimate to repair the Fulton roof for approximately $7,100 but Harwood told Demby it was too late. Harwood did not make any installment payments under the contracts and commenced this action.
 {¶ 14} Harwood asserts four assignments of error, which we address address together where appropriate for discussion.
 {¶ 15} "I. Evidence and its reasonable inferences presented a question of fact as to the validity of the Keller Williams purchase agreements and whether the documents contractually obligated appellant Dale Harwood; therefore, the trial court erred in directing a verdict in favor of William Pappas and Pappas Associates.
 {¶ 16} "II. Evidence and its reasonable inferences presented a question of fact as to the validity of the land installment contracts and whether the documents contractually obligated appellant Dale Harwood; therefore, the trial court erred in directing a verdict in favor of William Pappas and Pappas Associates."
 {¶ 17} In his first assignment of error, Harwood contends that he was not obligated under the Keller Williams Purchase Agreements, and that the trial court, therefore, erred in granting the Pappas Defendants' directed verdict for that reason. The Pappas Defendants agree that the Keller Williams documents do not obligate either party. Instead, it is the land installment contracts that form the basis of the contract between the parties. For the reasons set forth below, the trial court properly granted the Pappas Defendants' directed verdict based upon the terms of the land installment contracts and, therefore, the first assignment of error is without merit and is overruled.
 {¶ 18} Harwood contends that the Land Installment Contracts were null and void because they were not acknowledged by a notary on June 12, 2003. This contention lacks merit.
 {¶ 19} Harwood refers to the provisions of R.C. 5313.02 that require every land installment contract to conform to the formalities required by law for the execution of deeds and mortgages. R.C. 5313.01 requires land contracts to be acknowledged. Harwood does not dispute that the contracts were signed and acknowledged but instead claims that the acknowledgments were defective because Pappas did not sign the contracts before the notary on June 12, 2003.[7]
 {¶ 20} It is undisputed that Pappas signed the contracts on June 12, 2003 and faxed a copy to Priority One. The fact that the signature was not acknowledged until after June 12, 2003 does not negate the contractual validity or enforceability of the contracts. See CitizensNat'l Bank v. Denison (1956), 165 Ohio St. 89, 94 ("Acknowledgment has reference, therefore, to the proof of execution, and not to the force, effect, or validity of the instrument.")
 {¶ 21} It is not necessary for the notary to actually witness the person signing the document. Rather, the person need only inform the notary that he/she signed the document of their own free volition. "An acknowledgment is a public declaration or formal statement of the person executing an instrument, made to an official authorized to take the acknowledgment, that the execution of such instrument was the signatory's free act and deed. * * * In absence of statutory regulation it is notmaterial when an instrument is acknowledged, provided that it isacknowledged subsequent to its execution, during the time the instrumentis effective, and while the person taking the acknowledgement isauthorized to do so. * * * Generally, a person appearing before an officer for the purpose of acknowledgment is only required to, in some manner and with a view to giving it authenticity, make an admission to the officer of the fact that he has executed the instrument." FarmersProd. Credit Assn. of Ashland v. Kleinfeld (Jan. 15, 1986), Medina App. No. 1408, emphasis added; see, also, Citizens Home Sav. Co. v. CenturyConstr. Co. (1985), 27 Ohio App.3d 245, citing Mid-American Natl. Bank Trust Co. v. Gymnastics Internatl., Inc. (1982), 6 Ohio App.3d 11
(omission of the date mortgage is notarized will not invalidate mortgage).
 {¶ 22} Next, Harwood contends that because he did not receive possession on June 12, 2003, the contracts were null and void. Harwood contends that he made a "timed offer" making "time of the essence" in these contracts.[8] This contention also lacks merit. The contracts provide that "Vendor * * * agrees to give possession to Purchaser, on June 12, 2003 or on any other date mutually agreed by the parties hereto."[9]
(emphasis added). Harwood testified that he did not expect the deal to "close" on June 12, 2003. The contracts did not contain "time is of the essence" provisions. Harwood signed the contracts and tendered his down payments to PA without any written qualification or contingency. When the checks cleared, Radcliffe, Harwood's apparent agent, accepted delivery of the keys on his behalf. Harwood never attempted to revoke, rescind, or otherwise qualify his "offers" nor did he demand return of his down payments prior to the delivery of possession to him. Reasonable minds could only conclude that the parties agreed, by acquiescence or consent, to a date of possession beyond the date specified in the contracts. Accord Gardner v. Hidden Harbour Patners (Dec. 31, 1997), Lucas App. No. L-97-1182 (agreement was not invalidated by closing held beyond date specified in agreement where actions show an acquiescence in, if not an outright consent to, a closing date beyond the time specified in the agreement.)
 {¶ 23} The land installment contracts were neither void nor invalid based on the reasons stated by Harwood and set forth above. Accordingly, Assignment of Error II is overruled.
 {¶ 24} "III. Evidence and its reasonable inferences presented a question of fact as to whether appellees, Ray Demby and Murwood Real Estate Group, LLC, breached their agency and fiduciary responsibilities to Harwood; therefore, the trial court erred in directing a verdict."
 {¶ 25} Harwood contends that Demby and Keller Williams breached fiduciary obligations as a real estate agent by failing to disclose to him that Pappas would pay only $4,000 toward the Fulton roof repair and because Demby did not disclose the fact of his friendship with Pappas in writing.
 {¶ 26} To maintain a claim of breach of a fiduciary duty, the plaintiff must prove (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom. Strock v. Pressnell (1988),38 Ohio St.3d 207, 216. Assuming, without deciding, that the record contains sufficient evidence of the first two elements, Harwood failed to present any evidence that the alleged breaches of duty proximately caused him any injury. There is no evidence to suggest that Harwood would have done anything differently on June 12, 2003 had he known Pappas would contribute a maximum of $4,000. Harwood did not request a specific amount of contribution from Pappas nor did he make the contracts contingent upon the roof repairs.
 {¶ 27} When Harwood intially visited the Fulton and Detroit Properties in 2001, Demby had the exclusive listing on the properties. Demby admitted that he did not disclose his friendship with Pappas to Harwood in writing; however, he did not conceal the fact either. Nonetheless, Harwood never indicated that a written disclosure of the Pappas/Demby friendship would have made any difference in these transactions. Harwood and Demby also had a social relationship and Harwood does not dispute that he knew Pappas and Demby were friends. Therefore, while Harwood did establish a breach of Keller Williams' policy, the trial court did not err in granting the directed verdict because there is no evidence that the breach proximately caused injury.
 {¶ 28} Assignment of Error III is overruled.
 {¶ 29} "IV. Evidence and its reasonable inferences presented a question of fact as to whether appellees, Tom Karris and Priority One, were in a special relationship of trust with appellant, Dale Harwood, raising fiduciary obligations which were breached; therefore, the trial court erred in directing a verdict."
 {¶ 30} Harwood maintains that Karris and Priority One breached fiduciary duties as attorney and/or escrow agent for dispersing the funds he made payable to PA in accordance with the land contracts. Harwood argues that the disbursement failed to follow the terms of the agreement. We do not agree.
 {¶ 31} While Harwood claims he told Karris to "hold" the checks, he admits that there were no written instructions that prevented the disbursement. Harwood testified that he did not request Karris to make any changes to the contracts, did not request any contingencies, nor did he place any restrictions on the checks, although he knew he could have done so. The checks were cashed on June 16, 2003, yet Harwood did not complain until after he received the roof estimate on June 20, 2003 for approximately $18,000. There is no evidence that Karris had any knowledge or made any representations about the roofs on either property.
 {¶ 32} Based on the foregoing, the trial court did not err in granting the directed verdict.
 {¶ 33} Assignment of Error IV is overruled. Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The Court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J., and Corrigan, J., concur.
[1] Pappas Associates, Inc. and William Pappas (referred to herein as "PA Assoc." and "Pappas," individually and "Pappas Defendants" collectively); Murwood Real Estate LLC, dba Keller Williams and Ray Demby (referred to herein as "Keller Williams" and "Demby"); Tom J. Karris and Priority One Title, Inc. (referred to herein as "Karris" and "Priority One").
[2] At the close of plaintiff's case-in-chief, the trial court granted defendants Keller Williams and Demby's motion for directed verdict. At the close of evidence, the trial court granted defendants Karris and Priority One's motions for directed verdict as well as the motion for directed verdict of the Pappas Defendants.
[3] Although Harwood did not initial the waiver of inspection in line 123, he declined all of the various inspection options set forth in paragraphs 128-133 by checking the "No" boxes.
[4] Pappas was also an owner of Priority One until 2002 but continued thereafter to have some arrangement with Karris to receive 100% of the "net profits" from certain transactions he would refer to Priority One.
[5] Pappas informed Demby that he would not pay more than $4,000 but this exact figure was not communicated to Harwood.
[6] Harwood denies that Radcliffe was his agent for these transactions but dismissed his claims against Radcliffe prior to trial. Radcliffe did not testify.
[7] At oral argument, Harwood urged us to declare the contracts invalid for failure to adhere to statutory requirements and relied upon this Court's decision in Cuyahoga County Gen. Health Dist. v. White (July 13, 1995), Cuyahoga App. No. 68106. Unlike the contracts in this case, the preprinted form documents in White were never acknowledged by a notary.
[8] Time is not of the essence unless it has been made so by the express terms of the contract, or if the parties have treated it as such, or the nature of the contract requires it. Brock v. Hidy (1862),13 Ohio St. 306, paragraph one of the syllabus.
[9] Thus, the date of possession was not a "limited time offer" in comparison to offers contained in the case law relied upon by Harwood. E.g., Oblak v. Lawrence (Oct. 13, 1988), Cuyahoga App. No. 54473 (45-day option contract); Longworth v. Mitchell (1875), 26 Ohio St. 334 (contract gives purchaser limited time to accept offer); Noftsger Real Estate v.Berwanger (1970), 26 Ohio App.2d 90, 94 (offer limited to acceptance before midnight of a specified date).