JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Plaintiffs-appellants Mark Evans (Mark) and Irene Evans (Irene), or collectively (the Evans), appeal from the decision of the trial court which granted partial summary judgment in favor of defendant-appellee Chambers Funeral Home (Chambers). Chambers cross-appealed the decision of the trial court denying its motion for summary judgment in part. For the following reasons, we affirm.
 {¶ 2} On June 5, 2006, the Evans filed a complaint against Chambers alleging breach of contract, negligence, negligent misrepresentation, intentional misrepresentation, breach of fiduciary duty, fraud by concealment, and intentional infliction of emotional distress.
 {¶ 3} The facts giving rise to the instant case began on August 24, 1986, when Irene gave birth to their fourth son, Matthew Evans (Matthew). While at the hospital, Matthew contracted Group B Strep Sepsis and died on August 25, 1986.
 {¶ 4} Irene remained in the hospital for a total of six days. In the meantime, Mark went to Chambers Funeral Home, located at 4420 Rocky River Drive, Cleveland, Ohio, with his parents and his sister to make arrangements for Matthew's burial.
 {¶ 5} It must be noted that, in 1986, Daniel B. Chambers, Sr. (Dan, Sr.) was the acting president of the funeral home and his brother, William F. *Page 4 
Chambers (Bill), was the acting treasurer and secretary. Daniel B. Chambers, Jr. (Dan, Jr.) became president in 1997 or 1998. When the Evans filed the instant action on June 5, 2006, both Bill and Dan, Sr. were deceased.
 {¶ 6} Mark testified that he and Bill had a close personal relationship and indicated that Bill was "like family" to him. Mark testified that they played golf and often socialized together. (Dep. of Mark at 27.)
 {¶ 7} Mark, his parents, and his sister met with Bill and arranged for Matthew's cremation, as evidenced by the following documents: an authorization for cremation signed by Mark, an invoice for the service in the amount of $108.08, and a burial transit permit signed by Dan, Sr., on August 26, 1986, in order to transport Matthew for cremation.
 {¶ 8} Thereafter, Matthew was cremated at Cremation Services, Inc., a separate site, and his cremains[1] were returned to Chambers. The Evans did not arrange for an urn, a cemetery plot, a vault, or columbarium space for Matthew. Chambers held Matthew's cremains at the funeral home from 1986 until 2001.
 {¶ 9} On February 2, 2001, Dan, Jr. arranged for the burial of forty-one unclaimed cremains, including Matthew's, in a shared casket at Riverside Cemetery, Cleveland, Ohio. *Page 5 
 {¶ 10} Between 1986 and 2004, the Evans claim they contacted Chambers several times regarding the whereabouts of their son's cremains. Specifically, the Evans remember inquiring about Matthew during their attendance at four funerals, in 1993, 1998, 2000, and 2004 respectively.
 {¶ 11} It was on June 9, 2004, when Chambers provided burial services for Fred Evans, Mark's brother, that the Evans spoke with Dan, Jr., and found out for the first time that Matthew had been buried at Riverside Cemetery in 2001, after never being claimed by a family member.
 {¶ 12} Thereafter, upon the Evans' request, Dan, Jr. arranged to have Matthew's cremains disinterred. The funeral home paid for all expenses related to the disinterment. Dan, Jr. agreed to return the cremains to the Evans' home on June 18, 2004 around 5:00 p.m. It was Mark's and Irene's understanding that the cremains would be delivered to them personally; however, Dan, Jr. understood that he was to deliver the cremains to their home.
 {¶ 13} Dan, Jr. arrived at the Evans' home with Matthew's cremains at approximately 4:40 p.m. Mark and Irene were not home, and he left the cremains with their adult child.
 {¶ 14} On January 30, 2007, Chambers' filed a motion for summary judgment, which was granted in part and denied in part on April 23, 2007, as follows: *Page 6 
 "Upon review of defendant's motion for summary judgment, plaintiff's [sic] brief in opposition and the evidence presented, the court finds that reasonable minds can come to but one conclusion, being that defendant is entitled to judgment as a matter of law on the claims of intentional infliction of emotional distress, breach of fiduciary duty, and fraud. The claims of breach of contract and negligent infliction of emotional distress remain pending. Therefore, the court grants plaintiff's [sic] motion in part and denies it in part."
 {¶ 15} On May 8, 2007, the trial court granted the Evans' motion to certify the April 24, 2007 journal entry as a final appealable order:
 "Motion to certify the 4/24/07 judgment as final and appealable is granted. The court hereby orders that the partial summary judgment granted on 4/24/07 is a final and appealable order and there is no just cause for delay for the filing of an appeal on the court's ruling therein * * *."
 {¶ 16} The Evans appealed, asserting two assignments of error for our review. Chambers cross-appealed, asserting two assignments of error for our review.
 {¶ 17} In the interest of judicial economy, we address the Evans' two assignments of error together. PLAINTIFFS-APPELLANTS' ASSIGNMENT OF ERROR ONE
 "The trial court erred to the prejudice of plaintiff-appellant [sic] in granting defendant-appellee Chambers Funeral Home's motion for summary judgment on plaintiff's breach *Page 7 of fiduciary duty claim (April 24, 2007 Judgment Entry; May 8, 2007 Judgment Entry) [sic]"
PLAINTIFFS-APPELLANTS' ASSIGNMENT OF ERROR TWO
 "The trial court erred to the prejudice of plaintiffs-appellants in granting defendant-appellee Chambers Funeral Home's motion for summary judgment on appellants' intentional infliction of emotional distress and fraud claims (April 24, 2007 Judgment Entry; May 8, 2007 Judgment Entry) [sic]"
 {¶ 18} The Evans argue that the trial court erred when it granted Chambers' motion for summary judgment on their claim for breach of fiduciary duty. Additionally, the Evans argue that the trial court erred when it granted Chambers' motion for summary judgment on their intentional infliction of emotional distress and fraud claims.
 {¶ 19} We review motions for summary judgment de novo and thus:
 "[W]e afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. Under Civ. R. 56, summary judgment is appropriate when: (1) no genuine issues as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion which is adverse to the non-moving party." Ladanyi v. Crookes Hanson, Cuyahoga App. No. 87888, 2007-Ohio-540. (Internal citations omitted.)
FIDUCIARY DUTY *Page 8 
 {¶ 20} "To maintain a claim of breach of a fiduciary duty, the plaintiff must prove (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." Harwood v. Pappas Assoc, Cuyahoga App. No. 84761, 2005-Ohio-2442. "The elements of an action for breach of fiduciary duty are similar to those for ordinary negligence, with the difference being a need to establish that the duty arose out of a fiduciary relationship." Olympic Holding Co. v. ACE, 3rd Dist. No. 07AP-168, 2007-Ohio-6643.
 {¶ 21} "A `fiduciary' has been defined as `a person having a duty, created by his undertaking, to act primarily for the benefit ofanother in matters connected with his undertaking.'" Strock v.Pressnell (1988), 38 Ohio St.3d 207, citing Haluka v. Baker (1941), 66 Ohio App. 308. (Emphasis in original.) *Page 9 
 {¶ 22} Ohio law does not create a fiduciary duty between funeral homes and/ or funeral directors and their customers. "We do not find from a careful review of the reported Ohio cases a cause of action for wrongful burial. Nor is there a cognizable duty to provide a proper and dignified burial aside from appropriate contractual obligations which are not at issue here." Frys v. City of Cleveland (1995), Cuyahoga App. No. 68273,107 Ohio App.3d 281. The only contractual obligation established between the Evans and Chambers is contained in the Authorization for Cremation.
 {¶ 23} Furthermore, Ohio law permits crematories to dispose of cremains in a grave, crypt, or niche when the remains are not collected within sixty days of cremation. Pursuant to R.C. 4717.27(C)(1):
 "If the cremation authorization form does not contain instructions for the final disposition of the cremated remains of the decedent or body parts, if no arrangements for the final disposition of the cremated remains are made within sixty days after the completion of the cremation, and if the cremated remains have not been picked up by the person designated on the authorization form to receive them or, in the absence of such a designated person, by the authorizing agent, the operator of the crematory facility may dispose of the cremated remains in a grave, crypt, or niche at any time after the end of that sixty-day period."
 {¶ 24} The statute makes it clear that where cremains are unclaimed after sixty days, disposition is proper. Here, the earliest date upon which the Evans could specifically recall inquiring about Matthew's cremains was in 1993 at the *Page 10 
funeral of Harriet Rose, seven years after Matthew's cremation. (Dep. of Irene at 51-52). There is no evidence in the record that the Evans requested Matthew's cremains within sixty days of cremation. Furthermore, R.C. 4717.27 creates no statutory duty to notify the family of final disposition after sixty days.
 {¶ 25} Nor can we find the existence of a fiduciary duty owed by Chambers to Mark based upon his personal relationship with Bill. Thus, we cannot find the existence of a fiduciary duty owed by Chambers to the Evans or a breach thereof.
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
 "In order to recover on an action for intentional infliction of serious emotional stress four elements must be proved:
 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
 2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as `utterly intolerable in a civilized community,'
 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and
 4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it * * *." Pyle v. Pyle, Cuyahoga App. Nos. 45726 and 45831, 11 Ohio App.3d 31. *Page 11 
 {¶ 26} The Evans' first argument in support of their intentional infliction of emotional distress claim is based upon Bill telling Mark that Matthew is "taken care of." However, there is no evidence in the record that Bill knew or should have known that his statements would result in serious emotional distress to the Evans because there is no evidence that Bill knew Matthew's cremains were located in the lower level of the funeral home.
 {¶ 27} The Evans' next argument in support of their intentional infliction of emotional distress claim is based upon Chambers' attempt to charge the Evans for Matthew's disinterment. A review of the record reveals that the Evans requested the disinterment service. However, the Evans fail to demonstrate how Chambers' attempt to charge them for a service they requested is extreme, outrageous, or utterly intolerable in a civilized community. See Pyle at 34.
 {¶ 28} The Evans did not claim Matthew's remains within sixty days of cremation pursuant to R.C. 4717.27(C)(1), leaving Chambers with the option of disposing of the remains accordingly. Disinterment is a costly and time consuming process that the Evans requested eighteen years after Matthew's cremation and three years after Matthew's burial. Chambers ultimately paid all costs related to disinterment.
 {¶ 29} Additionally, the expert report of William C. Wappner (Wappner), on behalf of the funeral home, found the following: *Page 12 
 "In reviewing the statement for goods and services, the charges from Chambers Funeral Home were well below normal charges that would be expected. I am aware some funeral homes drastically discount their prices for children, and I expect Chambers did this as well. I believe Mark and Irene Evans were billed very fairly and received the services they paid for. I did note the Chambers Funeral Home did not include any charges for any type of disposition of Matthew Evans. It would be the Evans' responsibility to select a cemetery and purchase either a cemetery plot or a niche in a columbarium for the inurnment [sic] of Matthew. The funeral home was given no instructions as to final disposition of Mathew [sic]. Also, no urn was purchased, which indicates Mathew's [sic] cremains were to remain in the temporary container provided by the crematory."
 {¶ 30} Thus, it cannot be said that charging a customer for a service provided is extreme or outrageous or utterly intolerable.
 {¶ 31} The Evans also argue that Chambers committed intentional infliction of emotional distress when Dan, Jr. delivered Matthew's cremains to their oldest son. Dan, Jr. testified that he did not recall any agreement requiring that he drop off Matthew's cremains to Mark and Irene personally. (Dep. of Dan at 64). Dan, Jr. testified that he agreed with Mark and Irene Evans to drop off Matthew's cremains to their home because he lived nearby. (Dep. of Dan at 66).
 {¶ 32} Dan, Jr. further testified:
 "[B]ecause of the magnitude of this issue I wanted conclusion * * *. I wanted to do this as quickly and efficiently as possible without any further trauma with them going to *Page 13 the funeral home. I delivered them to their home." (Dep. of Dan at 67).
 {¶ 33} Further, there is no evidence of industry standards for personally delivering cremains. Wappner's expert report reads in part:
 "The fact that neither Mark nor Irene were not at home does not mean it is improper to leave Mathew [sic] at their home. * * * Dan Chambers went above the standard of care by personally delivering Mathew [sic] to the Evans' home, as requested, in a proper and expedient manner."
 {¶ 34} Thus, we find no evidence that the funeral home intended to cause emotional distress or should have known that personally delivering Matthew's cremains to Mark's and Irene's adult child would result in serious emotional distress.
 {¶ 35} Nor can we find that the funeral home's conduct was so extreme and outrageous as to go beyond all possible bounds of decency to be considered utterly intolerable in a civilized community. Chambers' conduct does not rise to the level required for intentional infliction of emotional distress.
 {¶ 36} On a final note regarding intentional infliction of emotional distress, there is a lack of evidence regarding proximate cause and injury. The Evans sought no physical or mental health treatment. The Evans made no demonstration of cognizable injury resulting directly from Chambers' actions.
 {¶ 37} FRAUD *Page 14 
 {¶ 38} Regarding their claim for fraud, the Evans argue that the trial court erred by granting Chambers' motion for summary judgment because Bill committed fraud when he told them that Matthew was taken care of.
 {¶ 39} The Supreme Court of Ohio set forth six elements for fraud:
"The elements of an action in actual fraud are:
 (a) a representation or, where there is a duty to disclose, concealment of a fact,
 (b) which is material to the transaction at hand,
 (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
 (d) with the intent of misleading another into relying upon it,
 (e) justifiable reliance upon the representation or concealment, and
 (f) a resulting injury proximately caused by the reliance." Gaines v. Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54.
 {¶ 40} The Evans asked what had happened to Matthew. Bill told them that Matthew was "taken care of." However, the record is void of any evidence that Bill's statements were made with knowledge of falsity or with utter disregard or recklessness. Nor is there any evidence that Bill intended to mislead the Evans in any way. Thus, the trial court did not err when it granted Chambers' motion for summary judgment on the Evans' fraud claim. *Page 15 
 {¶ 41} The Evans' first and second assignments of error are overruled.
 {¶ 42} In the interest of judicial economy, we also address Chambers' two assignments of error together.
DEFENDANT-APPELLEE/CROSS-APPELLANT'S ASSIGNMENT OF ERROR ONE
 "The trial court erred in not granting Chambers' summary judgment on the contract claim as the statute of limitations has run."
DEFENDANT-APPELLEE/CROSS-APPELLANT'S ASSIGNMENT OF ERROR TWO
 "The trial court erred in not granting Chambers' summary judgment as to appellants' claims for negligent infliction of emotional distress."
 {¶ 43} Chambers cross-appeals the trial court's partial denial of its motion for summary judgment, namely on the Evans' claims for breach of contract and negligent infliction of emotional distress.
 {¶ 44} "An order denying a motion for summary judgment is not a final appealable order." Overmeyer v. Walinski (1966), 8 Ohio St.2d 23. "Further, the addition of a Civ. R. 54(B) determination that there is no just reason for delay does not make an order denying summary judgment appealable." Walker v. Firelands Community Hosp., 6th
Dist. No. E-06-023, 2006-Ohio-2930.
 {¶ 45} Thus, Chambers' cross-appeal is taken from a non-final appealable order and is dismissed.
 Judgment affirmed. *Page 16 
It is ordered that appellee recover from appellants costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., P.J., and MELODY J. STEWART, J., CONCUR
[1] Cremains are the remaining ashes after cremation. *Page 1