[Cite as *Kademian v. Marger*, 2012-Ohio-962.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY   COUNTY

| | | |
|---|---|---|
| MICHAEL T. KADEMIAN, M.D., | : | |
| | : | Appellate Case No. 24256 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 2002-CV-2576 |
| v. | : | |
| | : | |
| DONALD MARGER, M.D., et al. | : | (Civil Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 9th day of March, 2012.

. . . . . . . . . . .

JAMES M. HILL, Atty. Reg. #0030633, James M. Hill Co., L.P.A., 2365 Lakeview Drive, Suite A, Beavercreek, Ohio 45431-3696
        Attorney for Plaintiff-Appellant

FELIX J. GORA, Atty. Reg. #0009970, Rendigs, Fry, Kiely & Dennis, LLP, One West Fourth Street, Suite 900, Cincinnati, Ohio 45202-3688
        Attorney for Defendant-Appellee

. . . . . . . . . . . .

PER CURIAM:

## I.  Introduction

{¶ 1}   Plaintiff-appellant Michael Kademian, M.D., appeals from a judgment rendered in favor of Defendant-appellee Donald Marger, M.D., following Marger's motion for a directed verdict at the close of Kademian's case.

{¶ 2}  Kademian contends that the trial court erred in granting the motion for directed verdict because reasonable minds could differ as to whether Dr. Marger breached his fiduciary duties to Kademian.  Kademian further contends that the trial court erred in rendering summary judgment in Marger's favor regarding Kademian's claim for conversion of his interest in  Marger & Associates.  Finally, Kademian maintains that the trial court erred in rendering summary judgment in Marger's favor on Kademian's claim for tortious interference.

{¶ 3}  We conclude that the trial court erred in directing a verdict in Marger's favor, because reasonable minds could differ on whether Marger's conduct violated his duty to act with the utmost candor and good faith, and whether his failure to so act caused injury to Kademian.  We further conclude that the trial court erred in rendering summary judgment in Marger's favor on conversion and on Kademian's claim for tortious interference.  There are genuine issues of material fact regarding whether Marger's actions in dissolving Marger and Associates were taken for a wrongful purpose, in order to squeeze Kademian out of the corporation and prevent him from being able to practice at area hospitals.

{¶ 4}  Accordingly, the judgment rendered in Marger's favor will be Reversed, and this cause will be Remanded for further proceedings.

## II.  Facts.  "Coincidences" Abound in the Hospital World.

{¶ 5}  In ruling on this appeal, we have construed the transcripts of testimony and documents admitted at the conclusion of Dr. Kademian's case most strongly in Dr. Kademian's favor.  The parties to the appeal, Dr. Michael Kademian and Dr. Donald Marger, were shareholders in a close corporation called Donald Marger M.D. & Associates, Inc. (M&A).  Donald Marger, a radiation oncologist, formed M&A in 1983, for the purpose of

practicing medicine. At the time, Marger was the sole shareholder in M&A. In 1983, Marger also began an association with Good Samaritan Hospital in Dayton, Ohio, and continued to practice radiation oncology at Good Samaritan until June 30, 2000.

{¶ 6} Michael Kademian was also a radiation oncologist and became employed by M&A in January 1990. At the time, Marger had been working at St. Elizabeth's Hospital (later known as Franciscan Hospital), and at Good Samaritan. After Kademian became employed, the two doctors each spent one-half day at each hospital, switching locations at noon.

{¶ 7} The following year, in January 1991, Kademian purchased 49% of the corporate shares, paying $2,500 as a down payment, and signing a promissory note for the remainder of the cost. The book value of the shares was derived by subtracting the assets from the liabilities and multiplying that amount by 0.49. The total price listed in the stock purchase agreement was $10,851.

{¶ 8} In April 1992, both Marger and Kademian signed Amended and Restated Employment Agreements with M&A. The agreements are essentially identical, and in Paragraph 5, prohibit Marger and Kademian from engaging "in the practice of medicine, specifically therapeutic radiology, except as an Employee of the Employer unless otherwise authorized by the Board of Directors." Plaintiff's Ex. 1, p. 2, and Plaintiff's Ex. 2, p. 2 .

{¶ 9} Paragraph 9 of the agreements also contains a non-competition clause, which provides that:

> 9. Non-Competition. Without the express written consent of the Employer, the Employee shall not directly or indirectly own, manage, operate,

join, control or participate in the ownership, management, operation or control of or be connected in any manner with the speciality practice of therapeutic radiology other than pursuant to the terms of this Agreement.

Upon termination of employment, the Employee covenants and agrees that except for the prior written consent of the Employer, the Employee will not engage in the practice of the speciality of therapeutic radiology, in any way, in St. Elizabeth's Hospital or Good Samaritan Hospital, both of Dayton, Ohio, nor with any other venture involving any hospital or institutions with which the Employer is or shall be associated, nor with any independent or free-standing facility within a geographic radius of ten (10) miles of St. Elizabeth or Good Samaritan Hospital, Dayton, Ohio. Such restrictions shall continue for a period of two (2) years from and after the termination of employment or existence of the Corporation or any successor thereto, including the death or retirement of the remaining shareholders of Employer, whichever time is shorter. Id. at pp. 3-4.

{¶ 10} Marger and Kademian continued to practice together for a number of years, performing radiation oncology services at Good Samaritan and at St. Elizabeth's Hospital. Good Samaritan was an "open hospital," which allows any radiation oncologist to obtain privileges and treat at the facility, because the hospital does not have an exclusive agreement with any one person or group. M&A had a strong relationship with Good Samaritan, as evidenced by the fact that Marger was the medical director of radiation oncology at Good Samaritan at the time of the events giving rise to the current litigation. Kademian had also

been the medical director at Good Samaritan.

{¶ 11} Around 1985, Dr. Robert Field was appointed as the medical director of radiation oncology at Miami Valley Hospital, a third hospital located in Dayton, Ohio. Field continued as medical director, and his group had an exclusive contract to practice radiation oncology at Miami Valley, between 1985 and the summer of 2000. This meant that only doctors in Field's group could treat patients in the radiation oncology department. Other doctors could be on staff at Miami Valley, but would not be allowed to treat patients in the department.

{¶ 12} In 1995, Premier Health Partners was formed, joining Miami Valley and Good Samaritan in one holding company. Miami Valley was a 60% shareholder and Good Samaritan was a 40% shareholder in Premier Health. In 1997, Miami Valley and Good Samaritan hired consultants to evaluate their oncology programs. The consultants recommended, in late 1997, that Good Samaritan and Miami Valley integrate their radiation oncology programs. Administrators at both Good Samaritan and Miami Valley encouraged Field's group and M&A to merge. Consequently, in early 1998, Marger formed a limited liability company with Field's group. This was done over the objections of Kademian, who was concerned about Field's abilities as a physician. At least as early as 1994, Miami Valley also had concerns over Field's leadership and clinical practice. In 1994, Miami Valley's chief operating officer (COO) required Field to prepare a corrective action plan for the business and clinical practice. Miami Valley did not think much of Field as a clinician, felt Field had a slipshod approach to medicine, and was continually attempting to get Field to improve. Kademian was aware of Field's reputation prior to the merger discussions, and told Marger he

did not believe Field was a good doctor.

{¶ 13} Another issue with Field was that in 1997, the Ohio Department of Health had established a requirement that medical directors of radiation oncology must be certified by the American Board of Radiology (ABR). Field was not certified by ABR. Kademian had been board-certified by ABR for many years, and was appointed medical director of radiation oncology at Good Samaritan in May 1997. Kademian notified Good Samaritan (which at that time was part of Premier Health), about Field's lack of appropriate certification, but Field remained director at Miami Valley. The issue of Field's lack of board certification resurfaced during the merger discussions.

{¶ 14} During 1998, Kademian received courtesy staff privileges at Miami Valley and began investigating Field's certification status. After Kademian called the president of Premier Health about Field's lack of ABR certification, Field was removed as medical director and was replaced by his associate, Dr. Duncan.

{¶ 15} Also in 1998, ill will began to develop between Marger and Kademian as a result of the proposed merger and Marger's sale of Western Ohio stock that was owned by M&A. Marger received the entire distribution from the sale, rather than allocating 49% of the proceeds, approximately $60,000, to Kademian. At one point, Marger stated that he wanted to "get rid" of Kademian. In addition, Kademian testified that he had learned during discovery of a prediction Marger had made in July 1998, to M&A's corporate attorney. The prediction was that Kademian was going to be removed as medical director at Good Samaritan. This "prediction" came true. In early September 1998, Kademian was removed as medical director over an incident involving a hearing aid that a nurse had misplaced at

work. Kademian contended that the matter was trivial and was not grounds for removal.

{¶ 16} Marger was appointed as medical director of radiation oncology at Good Samaritan about a week after Kademian was removed. Between October and December 1998, Kademian and Marger discussed the possibility of Kademian leaving M&A, due to these issues, but nothing ever came of the discussions.

{¶ 17} M&A had previously added Dr. Greg Rasp, another radiation oncologist, as an employee. Rasp was given a preliminary contract similar to the contract that Kademian originally had, and was supposed to be considered for partnership within a few years after his employment. When Rasp was considered for partnership, Marger wanted to retain his 51% share in M&A and require Kademian to give or sell one-half of his shares to Rasp. Kademian refused to divest himself of his interest, and this issue was never resolved prior to the dissolution of M&A.

{¶ 18} In January 1999, Rasp entered into a "restated" employment contract with M&A. This agreement provides that Rasp's employment would continue until terminated as provided in Section 10 of the agreement. Plaintiff's Ex. 198, p. 1. Under the agreement, Rasp was to maintain staff privileges at Franciscan Medical Center – Dayton Campus (formerly known as St. Elizabeth's) and such other hospitals at which he practiced. Id. at p. 5. The agreement also contains a restrictive covenant, which provides as follows:

> 11. <u>Restrictive Covenant</u>. Employee acknowledges (a) that the Employer has a large investment of time, effort and money in obtaining its relationship with the hospitals at which the Employer's employees practice medicine ("Hospitals"), with each such relationship hereafter referred to as a

"Relationship," (b) that the Employer's success depends upon its developing and maintaining such Relationships, (c) that each Relationship constitutes an asset and property of the Employer, (d) that the recruitment and orientation of employees to staff the Employer's needs represents a substantial investment by Employer, and (e) that Employee's performing services for the Employer constitutes a position of trust by the Employee which may result in a relationship whereby Employee could influence future actions of a Hospital or others relative to a Relationship.

Therefore, if a Relationship is terminated because the Employee solicited or agreed to perform (directly or indirectly) in the future similar services as were provided by the Employer's employees at a Hospital, then the Employer would be damaged and such interference, solicitation and/or agreement by the Employee would constitute a breach of trust and a breach of [sic] and the Employee's fiduciary duty to the Employer.

Accordingly, the Employee shall not breach the Employee's fiduciary duty to and position of trust with the Employer, and the Employee shall not, individually or in concert with any other person or entity, do anything to adversely influence or interfere with a Relationship. In addition, the Employee agrees that for a period of 12 months after the Employee's termination of employment with the Employer without cause, or the Employer's termination of the Employee's employment for cause, the Employee shall not, directly or indirectly, at a Hospital, whether alone, or as a shareholder, partner or member,

or as an officer, director, manager, employee, contractor or otherwise, perform services similar to those provided by the Employee during the Term.

Provided, however, if the Employer loses, breaches, surrenders or terminates its contract at Franciscan Medical Center – Dayton Campus or in any way curtails, limits or decreases the services it provides at Franciscan Medical Center – Dayton Campus, then the provisions of this Section shall be null and void and the Employee shall not be subject to the restrictive covenant provisions set forth in this Section.

The Employee represents and warrants that the enforcement of these covenants shall not preclude the Employee from earning a living in the practice of medicine. The Employee further recognizes that any violation of these covenants could result in immediate and irreparably injury to the Employer that may be enjoined. The Employer's remedies for breach of these covenants shall be cumulative, and the seeking or obtaining of injunctive relief shall not preclude a claim for damages or other relief.    Id. at pp. 11-13.

**{¶ 19}** During 1999, merger discussions with Field's group continued, despite the fact that Kademian wanted to end the discussions. In December 1999, Marger ended the discussions due to Field's failure to disclose financial information. At the time, no one knew that Field's group had been sold to U. S. Oncology, a for-profit cancer treatment national corporation.

**{¶ 20}** During the early part of 2000, M&A was beginning to have more of a physical presence at Miami Valley, and its doctors had been given limited privileges to treat patients,

despite the fact that Field's group had an exclusive contract. M&A's ability to practice was due to the issues with Field and the fact that Field had sold another party a free-standing radiation center that Miami Valley wanted to buy.

{¶ 21} In January 2000, a patient described at trial as Patient X was referred to Kademian for a decision on whether he should have radiation treatment for a possible reoccurrence of cancer in his prostate gland. Patient X had been previously treated at Miami Valley by Field.

{¶ 22} While taking Patient X's history, Kademian learned that Patient X had suffered severe radiation burns on his legs in 1999, after being treated by Field for skin cancer on his legs. Patient X was apprehensive about having more radiation treatments because he thought he might be overly sensitive to radiation. After obtaining the records for Patient X, Kademian discovered that the patient had been exposed to excessive amounts of radiation, and had been exposed in areas where radiation should not have been given. In addition to the severe burns that were caused, the treatment created a risk of future problems, like radiation necrosis or tissue death, which did, in fact, later occur with Patient X.

{¶ 23} In early February 2000, Kademian wrote a letter to Miami Valley's radiation safety officer, reporting the over-exposure and alleged substandard treatment, which Kademian contended should have been reported to the Ohio Department of Health. Kademian asked the hospital to address the issue, so he would know what to tell Patient X when they discussed radiation treatment for his prostate cancer. Kademian copied the letter to the chairman of the radiation safety committee, and to Gary Marshall, who was Premier Health's vice-president of Oncology Services for both Good Samaritan and Miami Valley.

**{¶ 24}** Kademian did not receive a response to this letter, so he sent another letter in early March to Marshall, indicating that he would have no choice but to report the over-radiation if the hospital did not report it. Kademian also requested a meeting with Marshall and Premier Health's general counsel, Dale Creech. In addition, Kademian copied Miami Valley's COO with the letter. Marshall replied, stating that nothing had occurred that needed to be reported, and that he would arrange a date for a meeting. Marshall also stated that it would be "unfortunate" if Kademian implicated the hospital in discussions he had with anyone, particularly since Miami Valley had not completed its investigation.

**{¶ 25}** Shortly thereafter, Kademian again wrote to Marshall, expressing discomfort over two other cases that had been handled by Drs. Field and Duncan. Kademian also pointed out perceived deficiencies in the way treatment, chart rounds, and peer review were being conducted in Miami Valley's radiation oncology department. And finally, Kademian raised issues about appropriate use of HDR therapy at Miami Valley.

**{¶ 26}** After being told by Marshall that he should approach Duncan about peer review, Kademian wrote Marshall again a few days later, indicating that his attempts to speak with Duncan had been rebuffed. Kademian also noted that when he questioned the use of HDR therapy on a patient, Duncan had told him that HDR was being done to "pay for the equipment." Finally, Kademian reported that both Duncan and Field had said the reason to do HDR therapy was to pay for expensive equipment and keep money in the department. Kademian expressed concerns that HDR was being used inappropriately and excessively at Miami Valley.

**{¶ 27}** Kademian and his attorney subsequently met with Premier Health's general

counsel, Creech, to discuss concerns about the radiation oncology department and the necessity of reporting the mis-administration overdose. During the meeting, Creech revealed Miami Valley's concerns about Field and his clinical qualifications. Creech also expressed the opinion that the overdose was not reportable, but told Kademian to go ahead and report it if he felt he should. After the meeting, Kademian then met with Rasp, Marger, M&A's attorney, and his own attorney. Rasp and Marger did not say not to report the incident. Marger asked Kademian not to report it to the Department of Health without telling him first, and Kademian agreed. Kademian later decided to go ahead and report the matter, however, because he was concerned and his concerns were increased by Creech's comments. Kademian found it troubling that the chief legal officer would say things like that about a physician (Fields), and still allow the physician to practice at the hospital.

{¶ 28} During the week of April 10, 2000, Kademian and his attorney met with representatives of the Ohio Department of Health, Bureau of Radiation Protection, which administers the radiation safety programs for the Department of Health. Kademian reported the alleged radiation overexposure of a Miami Valley patient. As a result of the meeting, an inspector arrived at Miami Valley on April 18, 2000, for an inspection. This was the first day Miami Valley would have become aware of the inspection. The inspector stayed for two days. Prior to the arrival of the inspectors, Miami Valley had not referred the Patient X matter to an independent consultant for review. In addition, Kademian had never received any substantive response from Marshall.

{¶ 29} An "absolute coincidence" occurred the first day of the inspection, according to Marger. On April 18, 2000, Marger told Rasp and Kademian that he (Marger) was leaving

M&A.   At trial, Marger testified that when he talked about leaving M&A, he had no idea that the state had come to investigate Miami Valley.   Conversely, Kademian testified that Marger is the one who told him that the Department of Health inspection had started on April 18, 2000. Marger and Kademian discussed whether or not Kademian should have gone to the Department of Health, and Marger said, "I can't control you.   You are affecting my health, Mike, you are affecting my blood pressure, you're affecting me emotionally * * * and you're going to be affecting me financially."   Trial Transcript, pp. 119-120.   During this discussion, Marger also told Rasp that he would "take care" of him.

{¶ 30} Miami Valley hired an independent consultant to peer-review the incident, but did not do so until after the Department of Health began its investigation.   On May 16, 2000, two more inspectors from the Bureau of Radiation Protection came to Miami Valley to continue the inspection.   Shortly thereafter, on May 23, 2000, Marshall, the vice-president of Oncology for both Miami Valley and Good Samaritan, and Bobbie Martin, the director of Oncology at Good Samaritan, discussed information that could only have come from Marger or Rasp.[1]

{¶ 31} Martin's notes about the conversation state "confidential Marger, MK will get notice this Thursday that corporation will be dissolved by next Friday. * * * "   Trial Transcript, p. 869, and Plaintiff's Ex. 123.   Martin's notes further indicate that KDD (referring to Doug Deck, the chief executive officer of Good Samaritan) would sign with the "new corporation," and that "MK" would have a period of time so continuity would not be

---

[1]Marger did not deny giving Marshall or Martin this information; he testified that he "could" have discussed this information with Martin.

disrupted. Trial Transcript, p. 870, and Plaintiff's Ex. 124. Other notes written by Martin indicate that "Marger needs to let Greg out of exclusive. Dissolve contract. * * * Give Greg exclusive contract," and "Appoint Greg as acting medical director. Have Marger let him out of the exclusive clause. Dissolve corporation. Award Greg exclusive contract." Trial Transcript, p. 871, and Plaintiff's Ex. 269 and 270.[2]

{¶ 32} On the same day these notes were made, notices were sent out indicating that a shareholder meeting to dissolve M&A would be held on June 2, 2000. On June 2, 2000, Marger voted to liquidate M&A, over Kademian's objection. The liquidation was effective June 30, 2000, with M&A ceasing active operations on that date. Before the dissolution, the corporate earnings of M&A were approximately $2,000,000 per year.

{¶ 33} Prior to the meeting on June 2, 2000, M&A's corporate attorney prepared Articles of Incorporation for Cancer Consultants of Southwest, Ohio, Inc., at Marger's request. Marger signed the articles of incorporation and the appointment of himself as statutory agent for Cancer Consultants on the same day that he voted to dissolve M&A. The articles of incorporation for Cancer Consultants were filed with the Ohio Secretary of State, and bear a date-stamp of June 5, 2000.

{¶ 34} Marger admitted having had discussions with Rasp about continuing a professional association together. When Marger had these discussions, he knew that Rasp was under a contractual agreement with M&A and would have to be released from that agreement. Marger acknowledged that he had also an employment agreement with M&A that contained a covenant not to compete, and that he knew, based on his discussions with M&A's

---

[2] Dr. Rasp's first name is Greg.

corporate attorney, that when a corporation is dissolved, all contracts referable to the corporation are null and void. Marger further admitted that dissolving M&A allowed him to form Cancer Consultants, and that he and Rasp had a plan to continue practicing full-time, as 50/50 owners of Cancer Consultants, at the same institutions where M&A and its doctors had practiced. At the time, Kademian was primarily practicing at Good Samaritan; the group as a whole practiced at Franciscan and Good Samaritan, with some limited practice at Miami Valley. Rasp knew that Marger was forming an entity so that the two of them could practice radiation oncology.

{¶ 35} On June 7, 2000, M&A's corporate attorney sent Marger copies of employment agreements for both Marger and Rasp with Cancer Consultants, and two copies of a shareholder's agreement for Cancer Consultants. On the same date, coincidentally or not, Medical Billing Services for the New Century (MBI), the billing service for M&A, sent Kademian a letter, refusing to provide billing services to him. The letter indicated that MBI had made the decision because of "the potential conflict of providing billing services for competitors within the same location." Plaintiff's Ex. 129. MBI then went on to provide billing services for Cancer Consultants.

{¶ 36} On June 8, 2000, Marger signed an application for a tax identification number for Cancer Consultants. Marger did not tell Kademian that he had formed Cancer Consultants, nor did he tell Kademian of the plans that he and Rasp had to practice together. During the same time period that he was setting up a new corporation and planning to practice with Rasp, Marger discussed the possibility of selling his shares in the already-dissolved M&A to Kademian. The plan did not come to fruition, because Marger wanted to leave open

the possibility of contracting with Miami Valley, and wanted Kademian to sign a provision relieving him of all liability. In addition, Kademian concluded that the corporation lacked the value that it had before Marger voted to dissolve it, because relationships with hospitals and corporate assets had been affected.

{¶ 37} Marger testified that he had an "epiphany," and decided to retire completely from the practice of medicine. He testified that he therefore aborted his intention to move forward with Cancer Consultants in mid-June 2000. However, on June 26, 2000, Marger faxed a health and life insurance application, listing his employer as Cancer Consultants.

{¶ 38} On June 22, 2000, the Good Samaritan medical chief of staff, Dr. Schoulties, met with Kademain regarding complaints that had been made by staff and patients. Some complaints were from 1998, and others were from late 1999, and the first half of 2000. None of the complaints had ever been previously presented to Kademian. Schoulties concluded that due process had not been served because Kademian was not counseled earlier when these complaints had occurred. Schoulties did not feel further investigation was warranted, but told Kademian that if these types of allegations continued, more formal action would be taken. Kademian was concerned that someone with an agenda was compiling complaints and not discussing them. During the same time-frame, complaints were also made about Marger's demeanor with patients, but Good Samaritan never raised this issue with Marger.

{¶ 39} In late June 2000, Kademian went on vacation. When he returned, he received a letter from Rasp dated July 4, 2000, written on Cancer Consultants letterhead. The letter lists the areas of practice as Good Samaritan, Miami Valley, and Franciscan. In the letter, Rasp states that: "Don told me on Friday (6/30/00) that he filed the documents to dissolve

Donald Marger, M.D. and Associates, Inc. Given that, I have formed the above named corporation." Plaintiff's Ex. 200.

{¶ 40} Kademian spoke to Rasp that afternoon, and was told that he should form his own corporation. Rasp did not, during this conversation, or any other, ask Kademian to join Cancer Consultants, nor did he suggest that Kademian might be able to join Cancer Consultants. Rasp also never disclosed to Kademian what had occurred regarding Marger and the formation of Cancer Consultants. Kademian also discovered that day that all the patients Marger had been treating, as well as those who were coming up for checkups months or years after their prior treatment, had been transferred to Rasp. Additionally, he discovered that Rasp had already had prescription pads printed for Cancer Consultants.

{¶ 41} Furthermore, Kademian called Upper Valley Radiation Center, located north of Dayton, and learned that Marger was working there full-time, despite having announced his retirement. At the time of trial, Marger was still working for the same employer, but worked part-time.

{¶ 42} In late July 2000, the Department of Health sent Gary Marshall, Premier Health Vice President of Oncology Services, a notice of violations letter and a report of its investigation of the Patient X situation, based on the findings of three investigators who had worked on the report. The notice detailed six violations, including lack of documentation to establish that Miami Valley was following proper procedures for addressing complaints; deficiencies in Miami Valley's timely submission of data to the Department of Health, problems with Miami Valley's quality assessment and improvement program; and a lack of documentation that the radiation oncologist set limits of doses to critical structures

surrounding the treatment area. The report also concluded that the inadequate quality assessment and improvement program and inadequate complaint handling process all contributed to a radiotherapy course that resulted in a "disproportionated output of the prescribed radiation dose across the treatment field." Plaintiff's Ex. 141, p. 2. The Department of Health ordered Miami Valley to submit various evidence and to develop a corrective action plan to address the violations within thirty days of receipt of the letter.

{¶ 43} Miami Valley's response was sent to the Department of Health on August 24, 2000. One of the attachments was a final report from Miami Valley's independent consultant, dated June 16, 2000. Consistent with Kademian's findings, the report concluded that the quality of care provided to Patient X fell below accepted standards of care.

{¶ 44} In June or July 2000, Kademian learned that Miami Valley was considering hiring Dr. Ditzel for the position of radiation oncology director. After meeting Ditzel, Kademian then met with Mary Boosalis, the vice-president and COO for Miami Valley, during the week of August 7, 2000. At the meeting, Kademian and Boosalis discussed the selection process for the director's postiion, Ditzel's qualifications, the quality of care in the radiation oncology department, and the Patient X matter. Kademian expressed concern over the selection process, because the job had not been advertised, and it was his understanding that the decision had already been made, with only one candidate, Ditzel, having been considered. On August 13, 2000, Kademian wrote a follow-up letter to Boosalis, opposing Ditzel's selection for two reasons. The first reason was that the selection process was flawed, and the second was that Kademian did not believe Ditzel was the most qualified candidate that could be found.

{¶ 45} Boosalis replied on August 17, 2000, stating that the decision of who to hire as medical director belonged to Miami Valley. Boosalis also told Kademian that he could only treat patients at Miami Valley until a new exclusive contract was signed with Dr. Ditzel's group. According to Miami Valley representatives, Miami Valley had discussed with Rasp the fact that Ditzel and a colleague, Dr. Paessun, were going to come to Dayton and practice with Rasp. The question was whether Kademian should continue to practice, and the consensus was that they would have a new group with Ditzel, Rasp, Paessun, and Kademian. However, after Kademian made his displeasure about Ditzel known, it was the collective decision of Boosalis, Bill Thornton, Miami Valley CEO, and Marshall, the vice-president of Oncology for both Good Samaritan and Miami Valley, that Kademian would not be able to practice.

{¶ 46} Kademian contended, however, that no one ever told him that they wanted him to stay at Miami Valley. In fact, Kademian tried to meet with administrators and they would not meet with him. He also tried to talk with Doug Deck, the president at Good Samaritan about staying at Good Samaritan; Deck refused to meet with him. In addition, Kademian testified that Rasp never came to him and said anything about working to try to include him in Cancer Consultants, nor did Rasp ever say anything to him after June 30, 2000, about working together. Rasp also never told Kademian that he was being scrutinized by the hospitals in any way in terms of coming into Cancer Consultants.

{¶ 47} In the fall of 2000, Good Samaritan and Miami Valley signed exclusive contracts with Cancer Consultants, which meant that Kademian would not be able to treat patients at either hospital, because he was not employed by Cancer Consultants. In addition,

Franciscan was not an option, because it had closed by that time.

{¶ 48} At trial, Kademian presented evidence indicating that he had lost the following amounts due to the alleged breach of fiduciary duty and civil conspiracy: (1) equity and goodwill in the amount of $203,651, based on the dissolution of M&A; (2) lost earnings, plus interest, of approximately $6,386,861 through March 31, 2010, and lost retirement contributions, plus interest. from 2001 through 2011, of about $350,529. The lost wages were calculated based on Kademian's 1999 earnings of approximately $456,000.

{¶ 49} In late September 2000, Kademian filed suit against Marger, M&A, Rasp, Cancer Consultants, Good Samaritan, Miami Valley, and Premier Health. The complaint was dismissed without prejudice and was refiled in April 2002, against the same parties. The complaint included claims of breach of fiduciary duty, breach of contract, and conversion against Marger; claims of breach of duty of loyalty and good faith, and breach of contract against Rasp; and claims of tortious interference with contract, tortious interference with business expectancy, violation of R.C. 4113.52, and civil conspiracy against all defendants. After motions to dismiss certain claims were sustained, Kademian filed an amended complaint in August 2003, adding claims of breach of a buy-sell agreement and breach of duty of good faith and fair dealing against Marger; claims of conversion against Rasp; claims of replevin against Marger, Rasp, and Cancer Consultants; and claims of constructive trust against Rasp and Cancer Consultants.

{¶ 50} In 2006, the hospital defendants were dismissed, with prejudice. Ultimately, the remaining claims were dismissed, other than the breach of fiduciary duty and conspiracy claims, which proceeded to trial, with Marger and Rasp as the remaining defendants.

Kademian settled his claims against Rasp during trial, leaving Marger as the sole defendant.

{¶ 51} At the end of Kademian's case, Marger moved for a directed verdict, which was granted by the trial court on the theory that Marger did not take advantage of the alleged breach of fiduciary duty and conspiracy, because he did not practice further with Good Samaritan and Miami Valley. Kademian appeals from the judgment rendered in favor of Marger.

### III. Did the Trial Court Err in Granting a Directed Verdict
### on Breach of Fiduciary Duty?

{¶ 52} Kademian's First Assignment of Error is as follows:

{¶ 53} "THE TRIAL COURT ERRED IN GRANTING MARGER'S MOTION FOR A DIRECTED VERDICT INASMUCH AS REASONABLE MINDS COULD DIFFER AS TO WHETHER DR. MARGER BREACHED HIS FIDUCIARY DUTIES TO DR. KADEMIAN."

{¶ 54} Under this assignment of error, Kademian contends that the trial court erred in directing a verdict in favor of Marger, because reasonable minds could differ regarding whether Marger acted in breach of his fiduciary duty by dissolving M&A.

{¶ 55} Civ. R. 50(A)(4) provides that:

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain

the motion and direct a verdict for the moving party as to that issue.

**{¶ 56}** We review the grant or denial of directed verdicts *de novo*. In conducting the review, we construe the evidence most strongly in favor of the nonmoving party. A motion for directed verdict must be denied "where there is substantial evidence upon which reasonable minds could reach different conclusions on the essential elements of the claim." *Anousheh v. Planet Ford, Inc*., 2d Dist. Montgomery Nos. 21960, 21967, 2007-Ohio-4543, ¶ 43. Furthermore, "[i]n deciding a motion for a directed verdict, neither the weight of the evidence nor the credibility of the witnesses is to be considered." *Cater v. City of Cleveland*, 83 Ohio St.3d 24, 33, 1998-Ohio-421,697 N.E.2d 610.

**{¶ 57}** Claims for breach of fiduciary duty require proof of the following elements: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Harwood v. Pappas & Assoc., Inc.*, 8th Dist. Cuyahoga No. 84761, 2005-Ohio-2442, ¶ 26, citing *Strock v. Pressnell,* 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988). A "fiduciary duty" is defined as " '[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary * * * to the beneficiary * * *; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person.' " *DiPasquale v. Costas*, 186 Ohio App.3d 121, 151, 2010-Ohio-832, 926 N.E.2d 682, ¶ 122 (2d Dist.), quoting *In re Trust of Bernard*, 9th Dist. Summit No. 24025, 2008-Ohio-4338, ¶ 20, which in turn quotes *Black's Law Dictionary* 545 (8th Ed.2004).

**{¶ 58}** In the case before us, a fiduciary duty arose from Marger's status as the majority stockholder in M&A. "Generally, majority shareholders have a fiduciary duty to

minority shareholders. * * * This duty is similar to the duty that partners owe one another in a partnership because of the fundamental resemblance between the close corporation and a partnership." *Crosby v. Beam,* 47 Ohio St.3d 105, 108, 548 N.E.2d 217 (1989). Accord *Werthmann v. DONet, Inc.*, 2d Dist. Montgomery No. 20814, 2005-Ohio-3185, ¶ 42. "Typically, a close corporation is a corporation with a few shareholders and whose corporate shares are not generally traded on a securities market." *Crosby*, at 107. In this regard, we have stressed that:

A drawback to the nature of a close corporation is that majority shareholders can easily abuse their corporate control to the disadvantage of the minority shareholders. Minority shareholders are particularly vulnerable because they are small in number and cannot easily protect their financial interests because there is usually no readily available market for their stock. Because of the close relationship between majority shareholders and the actual operation of a close corporation:

" * * * the form is peculiarly susceptible to a particular form of misuse or abuse by the majority or controlling shareholders. Commonly known as a 'squeeze-out' or 'freeze-out,' it refers to manipulative use of corporate control to eliminate minority shareholders * * * or otherwise unfairly deprive them of advantages or opportunities to which they are entitled." *Gigax v. Repka*, 83 Ohio App.3d 615, 620-621, 615 N.E.2d 644 (2d, Dist. 1992), quoting *Estate of Schroer v. Stamco Supply*, 19 Ohio App.3d 34, 37-38, 482 N.E.2d 975 (1st Dist. 1984).

{¶ 59} In the case before us, the trial court concluded that Marger had a right to dissolve the corporation and that no breach occurred because Marger failed to profit from his actions. We disagree. The trial court improperly focused on actions that occurred after the dissolution, and ignored Marger's prior conduct. After construing the evidence most favorably to Kademian, we conclude that reasonable minds could differ on whether Marger's conduct violated his duty to act with the utmost candor and good faith, and whether his failure to so act caused injury to Kademian. In reaching this conclusion, we express no opinion on the ultimate outcome of the litigation.

{¶ 60} As the above recitation of facts indicates, Marger took various actions both prior to, and at the time of, the corporate dissolution that cast doubt on his motives and suggest that he was involved in a plan with Rasp, and aided by Premier Health, to prevent Kademian from being able to practice at Good Samaritan and Miami Valley. Ill will between Marger and Kademian began in 1998, with their dispute over the sale of Western Ohio stock and Marger's formation of a limited-liability corporation with Field. Marger predicted to M&A's corporate attorney that Kademian would be replaced as medical director for Good Samaritan, and that happened shortly thereafter, with Marger being the replacement. Marger also stated that he wanted to "get rid" of Kademian.

{¶ 61} The dispute over the proposed merger continued into late 1999, when Marger finally abandoned the project. In April 2000, Marger became upset with Kademian over the Patient X matter, and indicated he was leaving M&A. However, instead of leaving the company, Marger planned to dissolve M&A, knowing, from discussions with his attorney, that when a corporation is dissolved, all covenants referable to the corporation become void.

Marger also knew that because of the covenants not to compete, both he and Rasp would otherwise be precluded from forming an entity so they could practice together at Good Samaritan and Miami Valley. And, Marger knew that by dissolving M&A, he and Rasp could practice together at hospitals where M&A had relationships.

{¶ 62} Marger admitted that he and Rasp had a plan to practice together, as 50/50 partners in Cancer Consultants. Marger took steps to accomplish this before he voted to dissolve M&A, by forming Cancer Consultants. Marger also obtained a tax identification number, and had the M&A corporate attorney prepare Cancer Consultants stock and employment agreements for himself and Rasp. Prior to the time M&A was dissolved, Marger or Rasp, or both, were attempting to obtain an exclusive contract with Good Samaritan, which would have precluded Kademian from working in the hospital where he had been employed full-time for approximately ten years. Furthermore, because of the dissolution of M&A, Kademian would not have been able to enforce the covenants not to compete, even though he had owned 49% of the corporation.

{¶ 63} Marger concealed his conduct from Kademain. He first led Kademian to believe that he was leaving the corporation. Then, during the time he was dissolving the corporation, he was planning with Rasp to form a competing corporation, and to obtain an exclusive contract at Good Samaritan. Reasonable minds could also differ regarding whether Marger's discussions with Kademian in June 2000, about purchasing M&A, were designed to mislead Kademian about what was occurring, and to further serve the purpose of letting Marger obtain a release of liability from Kademian. Notably, even after the time that Marger said he had aborted plans to proceed with Cancer Consultants (mid-June 2000), he was still

classifying himself as an employee of Cancer Consultants. Rasp also concealed his part in the plan, by pretending in early July 2004, that he was the one who had formed Cancer Consultants.

{¶ 64} Marger argues that he cannot be held liable, because he stopped practicing in Dayton and did not ultimately receive financial benefits from the transaction. However, the appropriate consideration in breach of fiduciary duty is not whether the alleged wrongdoer benefitted – it is whether an injury proximately resulted from the breach. *Harwood,* 2005-Ohio-2442, at ¶ 26. As an example, an individual could intentionally ruin another's business, simply for motives of ill will or malice, without any desire for personal gain, and no one would suggest that an injury had not occurred to the person whose business was destroyed. Likewise, an individual could conspire to injure another's business for reasons of personal gain, yet be unable, for various reasons, to realize those gains. The fact that Marger later chose not to be part of the new corporation, which did receive exclusive contracts to practice at Good Samaritan and Miami Valley to the detriment of Kademian's ability to practice, does not negate Kademian's injury sustained as a result of Marger's actions in dissolving M&A, along with its covenants not to compete, and the transfer of its existing assets, including goodwill and patients, to another entity. Marger used his majority control to his advantage at the time he dissolved the corporation, thereby freeing himself and Rasp from non-compete clauses and allowing the new corporation to be formed. At that time, it is reasonable to infer that Marger intended to benefit from his actions.

{¶ 65} A direct financial benefit to the breaching party is not required before a breach of fiduciary duty can be found, and an appropriate remedy fashioned. For example, in *Health*

*Alliance of Greater Cincinnati v. Christ Hosp.*, 1st Dist. Hamilton No. C-070426, 2008-Ohio-4981, several participating hospitals had entered into a joint operating agreement and had created a health alliance to manage area hospitals as an integrated system. Id. at ¶ 1. Ultimately, one of the member hospitals desired to withdraw from the alliance, claiming that the alliance had breached its fiduciary duty. The First District Court of Appeals held that the alliance had breached its fiduciary duty to the member hospital by using its superior position to constrain the hospital's ability to compete, by denying the hospital access to its own revenue stream, and by using the hospital's funds to pay for strategic planning on the alliance's behalf, while refusing to let the hospital engage in its own strategic planning. Id. at ¶ 23. The trial court had fashioned an equitable remedy, by allowing the hospital to withdraw from the alliance, and the court of appeals affirmed. Id. at ¶ 24.

{¶ 66} There is no indication in *Health Alliance* that the alliance had received a financial benefit from its actions. In fact, the case does not address financial benefit to the alliance. To the contrary, the focus is on the alleged damage to the injured party and how that damage might be remedied. Likewise, in the case before us, the focus should be on the damages sustained by Kademian as a result of Marger's alleged breach of fiduciary duty.

{¶ 67} We made the same general observations in *DiPasquale v. Costas*, 186 Ohio App.3d 121, 2010-Ohio-832, 926 N.E.2d 682 (2d Dist.), when we rejected an argument that the directors of a non-profit condominium association could not be held liable for breach of fiduciary duty. After discussing the holding in *Health Alliance*, we commented that:

> Thus, whether an organization is for profit or a nonprofit, the directors or
> corporation cannot receive benefits that are denied to a member, *nor can they*

*use their position unfairly to harm a member's interests.* These principles recognize that whether or not a corporation is organized for the purpose of generating a profit for itself, both types of corporation are normally organized for the purpose of advancing the interests of corporate shareholders or members, and *the requirement of fair dealing has at its heart the notion that one group of shareholders or members ought not take unfair advantage of another group, even when using a method to take unfair advantage that would otherwise be lawful; that is, the act would be lawful but for the relationship of the parties as co-shareholders or co-members. If only otherwise unlawful acts were excluded, there would be no need for the doctrine of fair dealing among partners, shareholders or members because otherwise unlawful acts would be precluded without resort to that doctrine.* (Emphasis added.) Id. at ¶ 134.

{¶ 68} Under the evidence presented at trial, reasonable minds could differ with regard to whether Marger's alleged breach of duty caused damages to Kademain. Accordingly, the trial court erred in granting Marger's motion for directed verdict.

{¶ 69} Marger argues that he had the right to dissolve the corporation. This is true. However, we have stressed that even if a particular close corporation or partnership decision cannot be contested, "the manner in which the decision is made cannot violate the majority's fiduciary duty." *Schafer v. RMS Realty,* 138 Ohio App.3d 244, 274, 741 N.E.2d 155 (2d Dist. 2000). In *Schafer*, a majority of partners issued a capital call, which was within their right to do under the partnership agreement. However, their action was taken in an attempt to squeeze out a minority partner. On appeal, we affirmed a jury verdict rendered in favor of the

minority partner, noting that while the minority partner "could not contest the capital call itself, he could bring an action for breach of fiduciary duty if the defendants acted in bad faith or in a duplicitous manner by voting for and proceeding with the capital call."   Id.

{¶ 70} Marger also contends that Kademian, himself, caused his own damages, by alienating the hospitals in connection with the hiring of Ditzel.   In order to recover damages, Kademian has the burden of proving that Marger's breach of fiduciary duty proximately caused his damages.  *See, e.g.*, *Anginoli v. Benenson Capital Co.*, 1st Dist. Hamilton No. C-980811, 2000 WL 955422, * 5 (Dec. 23, 1999).   Proximate cause is ordinarily a question of fact for the jury.  *Strother v. Hutchinson,*   67 Ohio St.2d 282, 288, 423 N.E.2d 467 (1981).

{¶ 71} The evidence on the issue of whether Kademian caused his own damages is conflicting.   While there is testimony indicating that Miami Valley and Premier Health were considering allowing Kademian to practice at Miami Valley as late as the summer of 2000, there is also testimony indicating that no one ever communicated this fact to Kademian.   The lack of communication of this alleged fact casts doubt on its veracity, particularly in light of evidence of a plan to exclude Kademian from practice at Good Samaritan prior to the time that M&A was dissolved.   One of the individuals involved was the vice-president of oncology for both Good Samaritan and Miami Valley.   A reasonable construction of the evidence is that this individual, as well as Miami Valley and Premier Health, would not have been pleased by Kademian's report of the Patient X matter to the Department of Health, or with the investigation of Miami Valley that followed the report.   In addition, the evidence indicates that Rasp never communicated an intent to hire Kademian or to involve him in Cancer Consultants, which ultimately received exclusive contracts for both Good Samaritan and

Miami Valley.          {¶ 72} Again, reasonable minds could differ on whether Marger's alleged breach of fiduciary duty proximately caused the damages claimed by Kademian. At the least, Kademian presented undisputed evidence that Marger's dissolution of M&A resulted in a loss of equity and business goodwill in the amount of approximately $203,651. This amount does not include the earnings and lost wages of Kademian as a result of having been foreclosed from practicing at Good Samaritan and Miami Valley, and would not have been affected by Kademian's alleged alienating actions concerning Ditzel's appointment.

{¶ 73} In light of the preceding discussion, Kademian's First Assignment of Error is sustained. The judgment rendered in Marger's favor will be Reversed, and this cause will be Remanded for further hearing.

## IV. Did the Trial Court Err in Rendering Summary Judgment in Marger's Favor on the Conversion Claim?

{¶ 74} Kademian's Second Assignment of Error is as follows:

{¶ 75} "THE TRIAL COURT ERRED IN GRANTING DR. MARGER'S MOTION FOR SUMMARY JUDGMENT AS TO DR. KADEMIAN'S CLAIM FOR CONVERSION OF HIS INTEREST IN MARGER & ASSOCIATES."

{¶ 76} Under this assignment of error, Kademian contends that the trial court erred in rendering summary judgment in Marger's favor on Kademian's conversion claim. According to Kademian, when Marger dissolved the corporation, he converted Kademian's 49% share of a lucrative corporation. Kademian also maintains that Marger unilaterally and improperly distributed one-third of the profits of M&A to Rasp upon dissolution.

{¶ 77} In response, Marger contends that Kademian's argument is a thinly veiled

effort to maintain that Marger did not have the right to dissolve the company. Marger also argues that Kademian failed to make this claim in his amended complaint.

**{¶ 78}** "A trial court may grant a moving party summary judgment pursuant to Civ.R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks,* 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d. Dist.1999), citing *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 375 N.E.2d 46 (1978). "We review summary judgment decisions de novo, which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16.

**{¶ 79}** In rendering summary judgment in Marger's favor on the conversion claim, the trial court noted that no dispute existed concerning whether Kademian owned 49% of the shares of M&A. The court next concluded that Kademian had failed to bring forward specific facts indicating that Marger converted his 49% interest by a wrongful act. The court rejected Kademian's argument that the dissolution of the corporation was a wrongful act or disposition of his interest. In addition, the court noted that Kademian had not made a demand for return of the 49% interest, and that a demand would be futile because the corporation was dissolved. Finally, the court stated that upon dissolution, there was nothing to return to Kademian other than what he had received.

**{¶ 80}** "Conversion is a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with

his rights." *Zacchini v. Scripps-Howard Broadcasting Co.*, 47 Ohio St.2d 224, 226, 351 N.E.2d 454 (1976). In *Schafer*, we concluded that the plaintiff was entitled to make a claim for conversion of his partnership interest, which was an intangible asset. *Schafer,* 138 Ohio App.3d at 282-286, 741 N.E.2d 155. The defendants in *Schafer* had issued a capital call, which they were entitled to do under the terms of the partnership agreement. However, the defendants had issued the capital call for a wrongful purpose, in order to reduce the plaintiff's partnership interest and squeeze the plaintiff out of the partnership. Id.

{¶ 81} In the case before us, although Marger had the right to dissolve the corporation, there are issues of fact regarding whether his actions were taken for a wrongful purpose, in order to squeeze Kademian out of the corporation and prevent him from being able to practice at Good Samaritan and Miami Valley. Thus, arguments that Marger had a "right" to dissolve the corporation do not absolve him from potential liability. We rejected a similar argument in *Schafer*, noting that:

> In assignment of error "E," the individual defendants contend that the trial court erred in overruling their motion for directed verdict and motion for judgment notwithstanding the verdict on the conversion claim. The primary argument defendants make in this context is that the capital call was not wrongful because it was permitted by the partnership agreement. Based on our prior discussion of the evidence, we disagree. Substantial, probative evidence was presented at trial indicating that the capital call was made for the purpose of depriving Schafer of his partnership interest. Id. at 286.

{¶ 82} Accordingly, Marger could be held liable for conversion, even if he had a right

to dissolve the corporation, just as the defendants in *Schafer* could be held liable for conversion, even though they had the right to issue a capital call.

{¶ 83} We also note that the trial court's comments in rejecting the conversion claim against Marger are inconsistent with his other conclusions in ruling on the summary judgment motion. The trial court concluded that there were factual issues regarding the breach of fiduciary duty claim against Marger and the civil conspiracy claims against both Marger and Rasp. The court noted that Marger had admitted in his deposition that he and Rasp had a plan to join together in a competing business that did not include Kademian, and that their plan was to dissolve M&A to avoid the non-compete provisions of the employment contracts that Marger and Rasp had with M&A. Docket #235, Decision, Order, and Entry Sustaining in Part and Overruling in Part Defendant's Motion for Summary Judgment, p. 16.

{¶ 84} "The measure of damages in a conversion action is the value of the converted property at the time of the conversion." *Brumm v. McDonald & Co. Securities, Inc.*, 78 Ohio App.3d 96, 104, 603 N.E.2d 1141 (4th Dist.1992). As we noted in connection with the breach-of-fiduciary-duty claim, Kademian presented evidence that the value of his lost interest in M&A at the time of dissolution was approximately $203,651, which included loss of equity and business goodwill. Again, this figure does not include lost earnings and wages, nor does it include the value of the client base transferred to Rasp. See *Elias v. Gammel*, 8th Dist., Cuyahoga No. 83365, 2004-Ohio-3464, ¶ 17 (concluding that "a dental practice, an intangible asset, can be converted. A dental practice includes, but is not limited to, good will, name, location, telephone number, years of practice, client base, and patient records. Professional practices are bought and sold every day. There is a distinct advantage

to buying a professional practice that has already been established. Customers, clients, and patients routinely patronize the same business that they have always gone to even if it 'changes hands.' ")

{¶ 85} Another component of Kademian's conversion claim is that he did not receive his 49% share of the receivables upon dissolution, the receivables having been paid one-third to Marger, one-third to Kademian, and one-third to Rasp. The evidence suggests that Rasp was not entitled to be paid for one-third of M&A's receivables. Under Rasp's employment agreement, all fees for professional services rendered belonged to M&A, and the compensation paid to Rasp under the agreement satisfied in full all of Rasp's claims upon M&A for compensation with regard to his employment. Plaintiff's Ex. 198, pp. 6-7. The only way in which Rasp would have been entitled to payment of the receivables would have been if he had become a shareholder. However, Rasp never achieved this status. Id. at pp. 8-9 (allowing for payment of percentage of accounts receivable to employee-shareholder as deferred compensation after termination of employment.) Thus, once Rasp's employment terminated, any receivables attributable to his efforts would have become the property of M&A and should have been distributed to Marger and Kademian according to their respective shares in the corporation.

{¶ 86} Marger argues that summary judgment was proper on Kademian's conversion claim, because the amended complaint failed to mention the one-third of the receivables that Marger allegedly gave to Rasp after the dissolution. Civ. R. 9(B) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The conversion claim is not a fraud claim, and the allegations in the

amended complaint are sufficient under notice pleading requirements to alert Marger to the conversion claim. In addition, the case was pending for several years before trial, during which time the parties had ample opportunity to learn of the basis for the claims of an opposing party.

{¶ 87} We do note, however, that Kademian failed to raise the issue of the receivables when he responded to Marger's motion for summary judgment. Therefore, Kademian waived this portion of his argument on appeal, by failing to present it to the trial judge. See *State ex rel. Zollner v. Indus. Comm.*, 66 Ohio St.3d 276, 278, 1993-Ohio-49, 611 N.E.2d 830. *Accord Care Risk Retention Group v. Martin*, 191 Ohio App.3d 797, 2010-Ohio-6091, 947 N.E.2d 1214, ¶ 78 (2d Dist.) (holding that "Failure to raise an issue in the trial court waives the argument on appeal.")

{¶ 88} The fact that the receivables argument may have been waived, does not mean that the trial court was correct in rendering summary judgment on the conversion claim. It simply means that Kademian failed to raise this argument in responding to summary judgment, and we may not use it on appeal as a basis for reversing the grant of summary judgment. As was noted, that is not the reason we are reversing the summary judgment rendered in favor of Marger on the conversion claim. We express no opinion on the ultimate resolution of these matters – that is the jury's role.

{¶ 89} Kademian's Second Assignment of Error is sustained.

**V. Did the Trial Court Err in Rendering Summary Judgment**

**in Marger's Favor on Kademian's Claim for Tortious Interference?**

{¶ 90} Kademian's Third Assignment of Error is as follows:

{¶ 91} "THE TRIAL COURT ERRED IN GRANTING DR. MARGER'S MOTION FOR SUMMARY JUDGMENT AS TO DR. KADEMIAN'S CLAIM FOR TORTIOUS INTERFERENCE."

{¶ 92} Under this assignment of error, Kademian contends that the trial court erred in rendering summary judgment in Marger's favor on Kademian's claims for tortious interference with contacts and tortious interference with a business relationship. The trial court noted that Marger's actions could not have interfered with a contract, because M&A did not have a contract to provide oncology services at Good Samaritan or at Miami Valley. The court further concluded that any contract Kademian had with M&A dissolved with the corporation. And finally, "for the same reasons," and without elaborating further, the trial court concluded that Marger was entitled to summary judgment on Kademian's claim for interference with business relationships.

{¶ 93} "The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 1999-Ohio-260, 707 N.E.2d 853, paragraph one of the syllabus. Similarly, "The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Wolf v. McCullough-Hyde Memorial Hosp.*, 67 Ohio App.3d 349, 355, 586 N.E.2d 1204 (12th Dist.1990).

{¶ 94} "The main distinction between tortious interference with a contractual relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.,* 148 Ohio App.3d 596, 604, 2002-Ohio-3932, 774 N.E.2d 775 (3d Dist.).

{¶ 95} Without repeating the entirety of the previous discussion, the evidence reveals genuine issues of material fact regarding whether Marger interfered with both existing contracts, and with existing and prospective business or contractual relationships. Marger knew that both he and Rasp were bound by non-compete clauses that would have prevented them from contracting with hospitals where M&A had existing employees and relationships. Marger took action to dissolve M&A so that he and Rasp could form a corporation that would directly compete where he and Rasp would otherwise not have been permitted to practice. Kademian did have an interest in M&A, which had contracts with both these individuals that would have precluded their competition, and Marger's actions in dissolving the corporation for the purpose of voiding those contracts, would have been wrongful, if done for that purpose. Accordingly, the trial court's conclusion that Kademian did not have a claim because the dissolution of the corporation ended the contract misses the point. The fact that M&A may have been wrongfully dissolved in order to avoid the contracts is the point.

{¶ 96} Furthermore, although Kademian did not have an existing contract with Good Samaritan or Miami Valley, he did have business relationships with both of them, which had intertwined officers, like the vice-president of oncology, who served both Good Samaritan and Miami Valley. There is evidence suggesting that Marger or Rasp, or both, attempted to

interfere with Kademian's business relationships by attempting to obtain exclusive contracts with Good Samaritan and Miami Valley.

In an action for tortious interference with business contracts, a plaintiff may recover all damages proximately caused by the tortfeasor's misconduct. Such damages include lost profits (reduced by the expenditures saved by not having to produce that profit) if both the existence of the loss and the dollar amount of the loss are proven to a reasonable certainty. Lost profit damages must be measured by the loss sustained by the plaintiff's business and not by its effect upon defendant's business. (Citations omitted.) *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.*, 112 Ohio App.3d 150, 157-158, 678 N.E.2d 248 (6th Dist.1996).

{¶ 97} In the case before us, Kademian's expert testified as to lost wages and profits, in the form of wages and earnings. The expert used a somewhat conservative estimate of $456,000, and compared this to income Kademian was able to earn in the years after M&A was dissolved.[3] No evidence was presented to contradict this, other than evidence which suggested – consistent with the defense theory – that Kademian, himself, was the architect of his own demise. As we have noted, this evidence presents factual issues to be resolved by a jury.

{¶ 98} Accordingly, there are genuine issues of material fact regarding Kademian's claims for tortious interference with contract and business relationships. The trial court

---

[3] We use the term "conservative," because Rasp's earnings in 2001 and 2002 were $732,061 and $857, 283, respectively. The other doctors at Cancer Consultants made similar amounts of money. The figure that was used to calculate Marger's lost income and profit were based on Marger's 1999 total income of $456,000, not these larger amounts.

therefore erred in rendering summary judgment in Marger's favor on these claims. Again, we express no opinion on the ultimate resolution of these matters.

{¶ 99} Kademian's Third Assignment of Error is sustained.

## VI. Conclusion.

{¶ 100} Marger moved to strike Kademian's reply brief on the ground that it was not timely filed. We have checked the record, and the brief was filed in a timely fashion. Marger's motion to strike Kademian's reply brief is therefore overruled.

{¶ 101} All of Kademian's assignments of error having been sustained, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.

. . . . . . . . . . . . .

GRADY, P.J., FAIN, J., and HALL, J., concur.


Copies mailed to:

James M. Hill
Felix J. Gora
Hon. Steven K. Dankof